**NORTHERN WIRE CORPORATION, Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

**Nos. 88–3278, 88–3461.**

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1989.

Decided Oct. 26, 1989.

Jack D. Walker, Susan C. Sheeran, Melli, Walker, Pease & Ruhly, Madison, Wis., for Northern Wire Corporation.

Aileen A. Armstrong, Collis Suzanne Stocking, Robert F. Mace, N.L.R.B. Appellate Court, Enforcement Litigation, Washington, D.C., Joseph A. Szabo, N.L.R.B., Milwaukee, Wis., for N.L.R.B.

Before CUDAHY, MANION and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

The petitioner, Northern Wire Corporation ("Northern"), seeks review of an order of the National Labor Relations Board (the "NLRB" or "Board") finding Northern in violation of sections 8(a)(1) and (3) of the National Labor Relations Act (the "NLRA" or "Act"), 29 U.S.C. §§ 158(a)(1), (3). The respondent, the NLRB, requests enforcement of its order. Northern challenges the findings of the administrative law judge (the "ALJ"), adopted by the Board, that the company violated section 8(a)(1) of the NLRA by threatening employees with reprisals for engaging in union activity, and section 8(a)(3) of the Act by discriminatorily issuing warnings to and suspending employees in order to discourage union activity. In addition, Northern disputes the Board's determination that Northern employees engaged in an unfair labor practice strike and thus were entitled to reinstatement and backpay. The order that the Board seeks to enforce requires Northern, *inter alia,* to cease and desist from engaging in further violations of the NLRA and to reinstate the employees who had participated in the strike with backpay. For the reasons discussed below, we conclude that the ALJ's findings are supported by substantial evidence and, accordingly, we grant the petition for enforcement of the Board's order.

**I.**

**A. *Background***

Northern is a Wisconsin manufacturer of wire forms. In April 1986, the Amalgamated Clothing Workers Union, AFL–CIO (the "Union") instituted an organizing campaign at Northern. Despite management's apparent opposition to union representation of Northern employees, the Union ultimately won a representation election in May 1986 and was certified in June 1986. While the ensuing bargaining efforts by Northern and the Union proved unavailing, hostility between management and the union employees escalated markedly. Ultimately, on October 6, 1986, the employees voted to engage in a strike, which commenced on October 8. The parties continued to bargain during the course of the strike until it ended on December 4, 1986. On that day, a Union official furnished a written statement to Northern representing the striking employees' unconditional offer to return to work. Northern, however, which had hired replacements, refused to reinstate the strikers immediately.

Meanwhile, the Union had filed several separate charges of unfair labor practices against Northern beginning October 14, 1986, six days after the strike had commenced, through January 7, 1987, a month after the cessation of the strike. On February 27, 1987, the General Counsel issued a complaint against Northern, which consolidated the unfair labor practice charges and included additional claims not contained in the formal charges previously filed by the Union.

**B. *Findings of ALJ***

On March 2, 1988, after reviewing extensive conflicting testimony presented at an administrative hearing, the ALJ found that Northern had committed multiple violations of sections 8(a)(1) and (3) of the NLRA.

The ALJ made comprehensive findings of the facts upon which the violations were based.

With respect to the section 8(a)(1) violations, the ALJ cited certain pre-election and post-election misconduct of Northern officials. In that connection, prior to the union election, Northern supervisor Mattos attended a meeting of pro-union employees at a local establishment and remarked that if the employees were unsuccessful in procuring the Union's election, all the "troublemakers" would be fired, and that if the Union was elected, Northern's owner would "lock the place up." App. of Northern at 8. Similar threats of plant closure were made to an employee by managers Arseneau and Frei. Subsequent to the election, supervisor Mattos advised a probationary employee, Zerbe, that if "the office got wind" of Zerbe's attendance at a union meeting, he could be "terminated." *Id.* at 12. Supervisor Hoffman also admonished an employee in this regard, warning, "I hope that you won't get involved [in union activity] because of what has been happening to Dale Fass [a staunch union activist who had received warnings and harassment from Northern]." *Id.* at 13. During June and July of 1986, supervisors Hoffman and Eberhardy told employee Fass that Northern was tired of the union activity and that it was going to "crack down" on employees and "tighten up" its discipline policies. *Id.* at 20–21. In late September, shortly before the impending strike, manager Arseneau threatened an employee that if the employees voted to strike, they might lose their jobs and Northern might "close the doors." *Id.* at 14.

Based upon testimony adduced at the administrative hearing, the ALJ also found that Northern had violated section 8(a)(3) of the NLRA in several respects. For instance, on June 19, 1986, after Fass had been warned that Northern intended to "crack down" on employee discipline, Fass arrived late to work. Consequently, he received a written warning advising him that "a subsequent violation will result in time off and or termination." *Id.* at 22. Thereafter, on July 23, Fass called North-

ern at 11:00 a.m. to inform his supervisor that he would be absent from work that day for personal reasons. The following day, Fass received a written warning and three-day suspension without pay for violating a company policy, which apparently was previously unenforced and unknown to employees, requiring that an employee call before 9:00 a.m. to inform Northern that he would be absent. Fass was again told that a subsequent violation would result in termination. On August 6, supervisor Wolff entered the washroom and issued a verbal warning to two members of the union organizing committee, Thomaschefsky and Schotz, for discussing union matters and "standing in the washroom on company time." *Id.* at 34. Another employee, who was present in the washroom but not a union activist, received no warning. Similarly, on September 2, supervisor Hoffman issued a written warning to employees Fass and Belant for talking, although the two were apparently discussing work-related matters. *Id.* at 24–26. Northern persisted in its disciplinary "crack down," and on September 29, 1986, a week before the strike, supervisor Eberhardy issued a tardiness warning to employee Coffey, a vocal union supporter, for punching in six minutes late.

Upon consideration of these factual findings, the ALJ found that the threats of reprisal, including references to discharge, rigorous discipline and plant closure, amounted to violations of section 8(a)(1). In addition, the ALJ found that the disciplinary actions taken by Northern officials were discriminatorily motivated in violation of section 8(a)(3) and would not have occurred absent union-related concerns. The ALJ dismissed several additional alleged violations, finding that they were predicated on untrustworthy testimony. Finally, the ALJ concluded that, although the strike was aimed in part to obtain a collective bargaining agreement, the strike was also caused in part by the above unfair labor practices of Northern. Accordingly, the ALJ ordered Northern to offer immediate and full reinstatement with backpay to those employees who had participated in

the strike and who had unconditionally applied for reinstatement. The ALJ also ordered Northern, *inter alia,* to cease and desist from engaging in the cited unfair labor practices and to expunge from its records any notations concerning the warnings and discipline found to be unlawfully issued. The Board affirmed the ALJ's decision with minor modifications.

## II.

### A. *Unfair Labor Practices*

■ Of course, it is well-established that this court is deferential in reviewing an NLRB decision.

Our task is to determine if the judgment of the NLRB is supported by substantial evidence on the record as [a] whole. We must defer to the expertise of the Board and will not displace its reasonable inferences even where a plenary review of the record might yield a different result. Moreover, we "must accept the Board's credibility findings unless the party challenging [those determinations] establishes [that] 'exceptional circumstances'" justify a different result.

*NLRB v. Jakel Motors, Inc.,* 875 F.2d 644, 646 (7th Cir.1989) (quoting *NLRB v. Dorothy Shamrock Coal Co.,* 833 F.2d 1263, 1265 (7th Cir.1987)). In determining whether substantial evidence supports the Board's decision, we must be satisfied that, based upon our review of the record, the result is " 'justified by a fair estimate of the worth of the testimony of witnesses or [the Board's] informed judgment on matters within its special competence....' " *NLRB v. Del Rey Tortilleria, Inc.,* 787 F.2d 1118, 1121–23 (7th Cir.1986) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 489–90, 71 S.Ct. 456, 465–66, 95 L.Ed. 456 (1951)).

■ Section 8(a)(1) proscribes employer conduct that interferes with, restrains or coerces employees in the exercise of their rights to form, join or assist labor organizations. *See* 29 U.S.C. § 158(a)(1).

Threats of discharge, discipline, plant closure or other reprisals against employees for engaging in union activity are unlawful and violative of section 8(a)(1) of the Act because these acts reasonably tend to coerce employees in the exercise of their rights, regardless of whether they do, in fact, coerce. *See NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679, 690–91 (7th Cir.1982); *see also NLRB v. Gissel Packing Co.,* 395 U.S. 575, 616–18, 89 S.Ct. 1918, 1941–42, 23 L.Ed.2d 547 (1969); *NLRB v. Del Rey Tortilleria, Inc.,* 787 F.2d 1118, 1122–23 (7th Cir.1986).

■ The ALJ's findings of section 8(a)(1) violations, affirmed by the Board, are based upon his resolution of conflicting testimonial evidence. Rather than cogently refuting any of the specific findings, Northern posits in rather general and conclusory terms that the findings overall are not supported by substantial evidence. Northern argues that the findings are based improperly upon uncorroborated testimony of self-interested Union witnesses and on the mere similarity of the allegations (such that the ALJ essentially bootstrapped each claim to support the others). We find Northern's critique of the ALJ's credibility determinations and method of weighing the testimonial evidence unconvincing. The ALJ expressly noted that, in making his findings, he "considered the self-interest of both pro union and pro company witnesses." App. of Northern at 49 n. 19. The ALJ carefully sifted through extensive testimony, discrediting some witnesses while crediting others, and rendered exhaustive findings of fact in support of his decision. In a record fraught with conflicting testimony, we will not reject the well-reasoned and fully articulated credibility determinations of the ALJ in the absence of "exceptional circumstances," which have not been established here.[1] The evidence indicates that Northern launched a campaign of threatened reprisals immediately following the Union's orga-

---

1. *In Medline Indus., Inc. v. NLRB,* 593 F.2d 788, 795 (7th Cir.1979), we described "extraordinary circumstances" as a "complete disregard for sworn testimony, coupled with a tongue in cheek characterization of those utterances." *Accord NLRB v. Jarm Enters., Inc.,* 785 F.2d 195, 203 (7th Cir.1986).

nizational drive. *See NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 690 (7th Cir.1982). As the ALJ concluded, the threats of plant closure and other reprisals for union activity reasonably tended to coerce employees in the exercise of their statutory organizational rights. *See* App. of Northern at 7–8, 10–11. Likewise, the ALJ found that threats to "crack down" and "tighten up" on discipline "could reasonably be construed as threats that [Northern] was tightening its disciplinary procedures either to punish union adherents or to retaliate against employees for having chosen the union to represent them." *Id.* at 25. Upon reviewing the record as a whole, we think substantial evidence supports the ALJ's findings that the cited statements by Northern officials reflected a calculated attempt to discourage employee organization in violation of section 8(a)(1) of the Act. *See NLRB v. Dorothy Shamrock Coal Co.*, 833 F.2d at 1266.

■ Similarly, we think the ALJ's findings with respect to the section 8(a)(3) violations are supported by substantial evidence. Section 8(a)(3) states that it is an unfair labor practice for an employer to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3). In assessing charges of unfair labor practices violative of section 8(a)(3), motive is a critical factor, *see NLRB v. Del Rey Tortilleria, Inc.*, 787 F.2d at 1123, to be determined as a question of fact. *See NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 626 (7th Cir. 1981). This court has articulated the proper burdens of proof and the types of evidence upon which the Board may rely:

> The General Counsel carries the burden of proving the elements of a section 8 unfair labor practice. Thus, the Counsel must establish that the discharge or other adverse labor practice was "based in whole or in part on antiunion animus—or ... that the employee's protected conduct was a substantial or motivating factor in the [employer's] adverse action." The employer, however, may

avoid liability by showing that his actions would have been the same "regardless of his forbidden motive." *Wright Line*, 251 N.L.R.B. 1083 (1980), *enf'd*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

\* \* \* \* \* \*

> The Board, however, is "free to rely on circumstantial as well as direct evidence" in assessing motive.

\* \* \* \* \* \*

> [The timing of the adverse action] also serves as evidence of the Company's motive.

*NLRB v. Jakel Motors, Inc.*, 875 F.2d at 646 (quoting *Dorothy Shamrock Coal*, 833 F.2d at 1266, 1267, 1267–68).

■ The ALJ found that Northern officials had acted with anti-union animus by discriminatorily issuing warnings to employees Fass, Belant, Thomaschefsky, Schotz and Coffey, and by suspending Fass. Moreover, the ALJ concluded that Northern had not rebutted the inference of anti-union animus by showing that the cited discipline would have been issued absent union concerns. Specifically, with respect to the warnings and suspension issued to Fass and the warning to Belant, the ALJ determined that Northern had acted discriminatorily in furtherance of an attempt to tighten disciplinary procedures against employees because the Union had won representation rights and because Fass was a leading union spokesman. App. of Northern at 30. In the same vein, the ALJ found that, in light of the other evidence of Northern's resolution to "tighten up" on discipline, the tardiness warning issued to Coffey and the verbal reprimands issued to Thomaschefsky and Schotz for discussing union matters in the washroom would not have been issued but for the Union's presence as bargaining agent and the active roles of the employees as union advocates. *Id.* at 32–34, 36.

As we acknowledged in *NLRB v. Dorothy Shamrock Coal Co.*, comments made by company officials demonstrating a "manifest hostility" toward union activity are relevant to determining discriminatory

motive. *Id.* at 1267. In addition, the degree of proximity of the union election to the company's adverse actions against employees is probative of motive. *Id.* at 1268. Thus, viewed in the context of Northern's ongoing display of animosity toward the Union and the close proximity of the challenged actions to the Union's election, we think substantial evidence supports the ALJ's findings of unlawful discrimination. Further, Northern has not demonstrated that the disciplinary measures reflect a legitimate effort to enforce a valid company rule or policy in an even-handed manner such that it would have taken similar actions against employees for such infractions regardless of their status as union activists. Nor has Northern otherwise rebutted the reasonable inference of discriminatory motive. *See Wright Line*, 662 F.2d at 908 & n. 15; *see also NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 691–93 (7th Cir.1982); *NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d at 626–27. Hence, we uphold the ALJ's findings, adopted by the Board, that Northern's discriminatory conduct against employees violated section 8(a)(3).

### B. *Cause of Strike*

A more compelling issue in this case is whether substantial evidence supports the ALJ's finding that the strike was an unfair labor practice strike. A strike that is caused *in whole or in part* by an employer's unfair labor practices is an unfair labor practice strike. *NLRB v. Lyon & Ryan Ford, Inc.*, 647 F.2d 745, 754 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981) (citing *NLRB v. My Store, Inc.*, 345 F.2d 494 (7th Cir.), *cert. denied*, 382 U.S. 927, 86 S.Ct. 315, 15 L.Ed.2d 340 (1965); *NLRB v. Waukesha Lime & Stone Co.*, 343 F.2d 504 (7th Cir. 1965)). Unlike employees who strike for economic reasons, unfair labor practice strikers " 'do not lose their [employee] status and are entitled to reinstatement with backpay, even if replacements for them have been made.' " *Id.* (quoting *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956)). The failure to reinstate unfair labor practice strikers upon their unconditional offer to return to work constitutes a violation of sections 8(a)(1) and (3) of the NLRA. *See Richmond Recording Corp. v. NLRB*, 836 F.2d 289, 294 (7th Cir.1987).

Thus, the proper characterization of the strike is of major consequence to the strikers' right to reinstatement and to the validity of the Board's remedial order. As we said in *NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691 (7th Cir.1976):

> If an unfair labor practice is a "contributing cause" of a strike, then as a matter of law, the strike must be considered as an unfair labor practice strike. If substantial evidence on the record as a whole supports the inference that the unfair labor practices committed by [the employer] were contributing causes of the strike, we must uphold the Board's finding and order.

> * * * * * *

> [W]e must ascertain whether there was "proof of causal connection between the two to justify the finding that the strike was bottomed in part upon unfair labor practices entitling striking employees to reinstatement."

*Id.* at 704 (citations omitted).

Northern contends that the Board erred in refusing to apply the *Wright Line* defense which governs mixed motive discrimination cases. *See Wright Line*, 251 N.L.R.B. 1083 (1980), *enf'd*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Under the *Wright Line* standard, Northern submits that it should prevail because it has demonstrated that, even in the absence of the unfair labor practices, the strike would have been called over the Union's demands for security and economic improvements. However, as the Board correctly pointed out, *Wright Line* does not provide the applicable standard in assessing strike causation. The dispositive question is whether the employees, in deciding to go on strike, were motivated *in part* by the unfair labor practices committed by their employer, not whether, without that motivation, the employees might have struck for some other

reason. *See Northern Wire Corp. v. Chicago & Central States Joint Board,* 291 N.L.R.B. 107 n. 4. *See also Richmond Recording Corp. v. NLRB,* 836 F.2d 289, 293 (7th Cir.1987); *NLRB v. Jarm Enters., Inc.,* 785 F.2d 195, 204 (7th Cir.1986) (" 'The employer's unfair labor practice need not be the sole or even the major cause or aggravating factor of the strike; it need only be a contributing factor.' " (quoting *NLRB v. Moore Business Forms, Inc.,* 574 F.2d 835, 840 (5th Cir.1978))); *Airport Parking Management v. NLRB,* 720 F.2d 610, 614 (9th Cir.1983) (collecting cases); *NLRB v. Cast Optics Corp.,* 458 F.2d 398, 407 (3d Cir.), *cert. denied,* 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972) (" 'if an unfair labor practice had anything to do with causing the strike, it was an unfair labor practice strike.' " (quoting *General Drivers & Helpers Union, Local 662 v. NLRB,* 302 F.2d 908, 911 (D.C.Cir.), *cert. denied,* 371 U.S. 827, 83 S.Ct. 48, 9 L.Ed.2d 65 (1962))).[2]

■ Even without the benefit of the *Wright Line* defense, Northern argues that the strike was not an unfair labor practice strike, but, instead, was an economic strike aimed solely at forcing Northern to succumb to the Union's bargaining demands. Northern asserts that most of the unfair labor practice charges initially alleged by the Union as the cause of the strike were dismissed. The dismissed charges involved various allegations of unlawful discharges, layoffs, failure to recall laid off employees, disciplinary reprimands and refusal to bargain in good faith. Northern contends that the remaining claims contained in the complaint filed by the General Counsel were too remote from the inception of the strike and too insignificant to be deemed the cause of the strike, even if they did constitute unfair labor practices. In sum, Northern submits that the *de minimis,* remote and mundane nature of the unfair labor practice charges establish that they were not the cause of

the strike but, rather, were contrived *post hoc* by the employees and the Union to obtain greater reinstatement rights for the strikers.

With respect to this issue, the ALJ found that Northern's insistence that the strike was conducted solely to obtain a bargaining agreement and was, hence, an economic strike "[flew] in the face of the evidence." App. of Northern at 48. We are constrained to agree. It is clear that the employees were quite concerned about the continual harassment of, and arbitrary disciplinary action against, Union supporters and others since the advent of the Union at Northern. As the ALJ noted, the warnings to Fass, Coffey, Thomaschefsky and Schotz were discussed among employees and at union meetings. At a bargaining session on October 3, 1986, a union representative informed Northern officials that, as the company continued to violate the labor laws, it could be looking at a "different kind of strike, an unfair labor practice strike." *Id.* at 42. At the strike vote meeting held on October 6, union officials discussed the labor contract proposals as well as the "unfair warnings and harassment" directed at bargaining committee members. The Union's chief negotiator declared, "It is time to think strike, put an end to the harassment and to get a contract." Another union representative, Talbott, denounced the "concentration camp" conditions at work, including the warnings to Fass, Thomaschefsky, Schotz and others, as well as the suspension of Fass and the repeated threats of plant closure. Talbott also stated that because Northern's actions constituted unfair labor practices, she believed that the employees would be entitled to greater job protection if they struck since they would be engaged in an unfair labor practice strike. *See id.* at 43–44, 47. Immediately thereafter, in an "almost unanimous" vote, the employees agreed to strike. *Id.* at 45. During the course of the strike, the picketers circulated a leaflet

**2.** Northern has not convinced us that we ought to import into the strike causation context the rules governing the shifting of burdens of proof that have been tailored to fit employer discrimination cases. In any event, the ALJ found that, even if *Wright Line* provided an appropriate approach in this context, Northern had failed to demonstrate that the strike would have occurred in the absence of the unfair labor practices.

stating, "Our strike is not about money. It is about injustices, job security and unfair labor practices ..." *Id.*

We think these circumstances would justify the Board in concluding that the unfair labor practices caused, at least in part, the employees to engage in a strike. As the ALJ determined, the warnings and threats were not too insignificant and too remote in time from the initiation of the strike to be deemed a contributing cause; instead, these events were viewed rather seriously by the employees as "on-going incidents ... [in] a campaign of harassment against union leaders particularly members of the bargaining team." *Id.* at 51. Although the first unfair labor practice charges were filed six days after the strike had commenced, we do not agree with Northern's submission that these filings were clearly an afterthought and thus did not involve a contributing cause to the strike. Irrespective of when the charges were filed, all the incidents actually occurred shortly before the strike and most were specifically adverted to at the strike vote meeting. Moreover, as the ALJ concluded, the later filed charges "were of a piece with the contemporaneously filed charges" and part of the overall pattern of harassment aimed at curtailing union activity. *Id.* at 52.

Therefore, we believe that substantial evidence supports the ALJ's finding that the strike was caused in part by the cited unfair labor practices and we enforce the Board's remedial order entitling the strikers to immediate reinstatement and backpay.[3]

## C. *Section 10(b)*

 Finally, we reject Northern's argument that the Board's complaint allegations that were not the subject of formally filed charges by employees were barred from prosecution by section 10(b) of the Act, 29 U.S.C. § 160(b).[4] "A complaint or an amended complaint ... may allege violations not alleged in the charge if they did not occur more than six months prior to the filing and service of the charge, and they are closely related to the violations which are contained in the charge." *NLRB v. Complas Indus., Inc.,* 714 F.2d 729, 733 (7th Cir.1983).

> Once the Board initiates a legal proceeding on the basis of a formal charge "it may allege whatever it finds to be a part of [the] controversy, [so long as it does not get] so completely outside of the situation which gave rise to the charge that it may be said to be initiating the proceeding on its own motion, [for] then the complaint [would] fall as not supported by the charge."

*Id.* at 733 n. 3 (quoting *NLRB v. Kohler Co.,* 220 F.2d 3, 7 (7th Cir.1955)). "Section 10(b) is to be broadly construed so as to permit the [General Counsel] to include in

---

**3.** Northern relies heavily on *NLRB v. Colonial Haven Nursing Home, Inc.,* 542 F.2d 691 (7th Cir.1976), for support of its position on the strike causation issue. There the Board reversed the ALJ's finding that a strike was not caused in part by unfair labor practices. On appeal, this court reversed the Board, thereby aligning itself with the ALJ. Deferring to the credibility determinations of the ALJ, this court noted that several of the alleged unfair labor practices arose *after* the decision to strike, while others were minor incidents of section 8(a)(1) misconduct occurring well before the strike. These factors buttressed the ALJ's conclusion that the unfair labor practices were not a "contributing cause" of the strike. By contrast, the unfair labor practices in the present case all preceded the strike; the charges involved a pattern of harassment comprising more significant incidents of discrimination violative of section 8(a)(3) as well as violations of section 8(a)(1); and several of the unfair labor practices were discussed at a meeting immediately prior to the employees' near unanimous vote to strike. Thus, we agree with the ALJ that *Colonial Haven* is readily distinguishable.

**4.** Title 29 U.S.C. § 160(b) provides in pertinent part:

> Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board ... shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing ...: *Provided,* That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made.... Any such complaint may be amended ... at any time prior to the issuance of an order based thereon....

the complaint any matter of the same general nature as that asserted in the charge." *NLRB v. Braswell Motor Freight Lines, Inc.*, 486 F.2d 743, 746 (7th Cir.1973).

In the present case, several of the unfair labor practices were the subject of formally filed charges, including the warnings issued to Thomaschefsky and Schotz for talking in the washroom about union matters, the threat of termination to Zerbe for attending a union meeting, the tardiness warning issued to Coffey for punching in six minutes late and the warning issued to union activist Fass for failing to report his absence before 9:00 a.m. *See* Supp.App. of Northern at 3–9. We agree with the ALJ and the Board that the additional section 8 violations, which were included in the Board's complaint but not in formally filed charges, were not barred by operation of section 10(b). The additional warnings to Fass and Belant, as well as the various threats to "tighten up" discipline and take other retaliatory action such as plant closure and termination, clearly were "closely related" to the unfair labor practices contained in the formal charges and did not occur more than six months prior to the filing of the formal charges. *See NLRB v. Complas Indus., Inc.*, 714 F.2d at 733 (complaint allegation of unlawful interrogation sufficiently related to charge of illegal discharge for purposes of section 10(b) of the Act). To be sure, all the unfair labor practices committed by Northern related to an ongoing pattern of harassment of union supporters and a crusade directed against the Union virtually since the inception of the organizing campaign and thus were sufficiently related for purposes of section 10(b) of the Act. *See NLRB v. Braswell Motor Freight Lines, Inc.*, 486 F.2d 743, 746 (7th Cir.1973) (complaint allegations sufficiently related to charges where the

"company's conduct ... was part of an overall plan to resist [union] organization").[5]

### III.

For all the foregoing reasons, we GRANT the Board's application for enforcement and DENY Northern's petition for review.

---

5. This case is quite distinguishable from *G.W. Galloway Co. v. NLRB*, 856 F.2d 275 (D.C.Cir. 1988), which Northern cites for support. In *G.W. Galloway*, the D.C. Circuit held that section 10(b) precluded the prosecution of unfair labor practice allegations where the General Counsel had attempted in his complaint to expand the filed charges by relying solely on the catchall "other acts" boilerplate contained in a pre-printed charge form. In *G.W. Galloway*,

there was no close relationship between the complaint allegations and the formal charge and there was no continuing campaign by the company against the Union. *Id.* at 280–81. In the instant case, however, there was no reliance on "other acts" boilerplate, there was a sufficiently close relationship between the complaint allegations and the formal charges as well as a discernible pattern of harassment and an orchestrated campaign against the Union.