# In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-2209 & 02-2566

NATIONAL LABOR RELATIONS BOARD,

*Petitioner/Cross-Respondent,*

*v.*

MIDWESTERN PERSONNEL SERVICES, INC.,

*Respondent/Cross-Petitioner.*

Application for Enforcement and Cross-Petition for
Review of an Order of the National Labor Relations Board.
Nos. 25-CA-25978-5, 25-C-25823-3 & 25-C-25503-2

ARGUED DECEMBER 2, 2002—DECIDED MARCH 11, 2003

Before BAUER, POSNER, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Midwestern Personnel Services refused to reinstate 26 striking employees after the union that a majority of its employees had selected as their bargaining representative made an unconditional offer to return to work. Midwestern refused to reinstate the strikers because, in its view, the strike was staged solely for economic reasons, which if true would permit it to permanently replace the strikers. But the National Labor Relations Board concluded that the strikers were motivated in part by unfair labor practices, and thus were entitled to immediate reinstatement under Sections 8(a)(3)

and (a)(1) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(a)(3), (a)(1). The Board now petitions for enforcement of its order to reinstate the strikers, and Midwestern petitions for review. Because we conclude that substantial evidence on the record as a whole supports the Board's conclusions, we grant the petition for enforcement and deny the petition for review.

## I.

Midwestern provides cement and transport truck drivers to River City Holdings, Inc., which sells concrete mix and related products from facilities located in Boonville and Rockport, Indiana, and Owensboro, Kentucky, as well as other locations. As of early 1997, Midwestern supplied between 40 and 50 drivers to the three River City facilities. In April 1997, River City announced to Samuel Ware, Midwestern's president, that it had agreed to supply cement products to a job site known as the "AK Steel job" from its Rockport plant, and that it would need to increase the number of drivers working out of Rockport from seven to about sixteen. River City also informed Ware that AK Steel was a union job site, and that it understood that Midwestern's drivers would need to hold union authorization cards in order to enter the property.

Midwestern's Indiana and Kentucky drivers were not union-represented. But at the time Midwestern had a collective bargaining agreement with the Chauffeurs, Teamsters, and Helpers ("Teamsters") Local Union 836 in Middletown, Ohio, covering Midwestern's employees based in York, Pennsylvania, although none of these employees worked at River City facilities. Ware placed a call to Local 836's business agent, Tom Kinman, whom he had dealt with in the past, to inquire whether Local 836 would "come into" Indiana. Kinman responded that

it would and agreed to meet with the Rockport drivers on June 2, 1997. Ware then told James Teegarden, Midwestern's area manager, that he planned on adding the Rockport drivers within the coverage of the existing collective bargaining agreement with Local 836. To help him prepare for the meeting with the drivers, Teegarden sent Kinman information about Midwestern's Indiana operations and employees. Shortly before the meeting took place, Ware and Kinman negotiated the terms of the addendum. They agreed that the Rockport drivers would receive a 20-cent per hour raise (Kinman insisted on this) but would otherwise maintain their existing benefits and terms of employment. In all other respects, the addendum was identical to the contract covering the York employees, which included a no-strike clause.

Ware typed the addendum himself sometime on June 2, 1997. That same evening, Midwestern's seven Rockport drivers, accompanied by Teegarden, met Kinman at a local restaurant after their shifts. Teegarden opened the meeting by circulating an attendance sheet and directing each driver to sign it, and by introducing Kinman, who distributed unsigned union authorization cards. Teegarden then told the drivers about the AK Steel job and explained that AK Steel was unionized and that they would have to join the union to enter its property. Teegarden further explained that this meant that the drivers would have to join the union if they wanted to keep working at Rockport. Teegarden then announced that Midwestern and Teamsters Local 836 were prepared to include them in the existing collective bargaining agreement. Teegarden then left the room to allow Kinman to speak. Between 15 and 45 minutes later (the precise time is disputed) one of the drivers asked Teegarden to come back into the meeting to answer a question. The driver asked Teegarden what would happen if the drivers signed the authorization cards but still did not want

to join Local 836. Teegarden responded that if they voted to let the union in, they would have to join the union to continue driving trucks out of Rockport, "or something to that effect," he would later testify. At the end of the meeting, all seven drivers signed the cards, but no formal vote was taken whether to join Local 836. The following day, Kinman faxed copies of the signed cards to Ware.

Discontent soon arose among the drivers about what they perceived as being forced to join an out-of-state union. Word of their unhappiness quickly spread to Teamsters Local 215 in Evansville, Indiana, which then sought to organize Midwestern's Rockport, Boonville, and Owensboro drivers. By July 1997, several drivers from each location had signed union authorization cards with Local 215, and on July 29 Local 215 filed unfair labor practices charges with the NLRB against Midwestern. Local 215 also filed an internal grievance with the International Brotherhood of Teamsters ("IBT") complaining that Local 836—which by then had merged with Teamsters Local 100 in Cincinnati and was known as Local 836/100—violated internal union rules by entering Local 215's territory. On September 11, 1997, Local 836/100 informed Midwestern that it was returning all dues remitted by the Rockport drivers for August 1997, and that all future dues should be sent to Local 215 in Evansville. Local 836/100 also informed the IBT that it did not oppose "transferring" the Rockport drivers to Local 215, although Local 836/100 did not formally disclaim its interest in representing the Rockport drivers until December 5, 1997.

On October 1, 1997, Midwestern received a letter from Local 215 announcing that Local 215 represented a majority of Midwestern's drivers working from River City's Rockport, Boonville, and Owensboro facilities, and requesting recognition as the drivers' bargaining unit. Midwestern did not respond favorably to Local 215's letter, and soon Ware began to hear rumors of a strike. In late

November Ware dispatched Teegarden to meet with the drivers and determine whether the rumors were true. After learning that the rumors were indeed true, Teegarden warned the drivers that they were still subject to the collective bargaining agreement between Midwestern and Local 836/100, including its no-strike clause. The drivers then demanded a meeting with Ware. Ware met with the drivers on December 1 and 2, and he repeated Teegarden's warning, admonishing the drivers that the no-strike clause in the Midwestern-Local 836/100 contract permitted Midwestern to terminate and permanently replace any striking employees. Ware added that Midwestern might also take disciplinary measures or legal action. Some of the drivers responded by demanding representation by a local union rather than one based in Ohio.

Ware followed up the meetings by mailing a letter to each employee confirming Midwestern's position that the collective bargaining agreement with Local 836/100 was enforceable "until proven different by the NLRB" (a hearing before the Board on Local 215's unfair labor practices charges was scheduled for January 20, 1998); that Midwestern would consider any strike to be a violation of the no-strike clause and hence unprotected by federal labor law; and that Midwestern would terminate, discipline, or sue strikers. Shortly after this, Ware received a letter from Local 836/100 disclaiming representation of the Rockport drivers. This prompted Ware to contact Local 215, and a short time later Ware met with Lewis Smith, Local 215's secretary-treasurer, and Joe DiMatteo, Local 215's business representative, to discuss the terms of the collective bargaining agreement with Local 836/100 and possible settlement of the unfair labor practices charges then pending before the Board. Ware made known his beliefs that Local 836/100 had transferred its representation of the Rockport drivers to Local 215, and

that the contract with Local 836/100 "went with the transfer" and remained effective. By letter a few days later, Ware offered to recognize Local 215 if the union agreed to the terms in the agreement between Midwestern and Local 836/100, and if Local 215 withdrew its pending unfair labor practices charges with the NLRB. Smith later called Ware to follow up, but nothing was resolved.

The drivers met at Local 215 on January 13, 1998, a week before the hearing on the union's unfair labor practices charges. After listening to a progress report from Smith and DiMatteo on their negotiations with Midwestern, several drivers, including Chris Means and Gerald Fickas, complained of harassment and threats by the company for expressing their willingness to strike. They also complained that Midwestern had "shoved a local out of Ohio down their throats," and that the company continued to threaten them with the no-strike clause, even though Local 836/100 had disclaimed representation. The drivers then voted to strike, but DiMatteo persuaded them to hold off initiating the strike pending the outcome of a meeting the next day with Midwestern, and to allow him to set the date of the strike. At the meeting the following day, the union and Midwestern exchanged initial contract offers, and reached agreement on a few matters. But they disagreed on major issues such as recognition, pension terms, and duration of any contract, and at the conclusion of the meeting Ware remarked that he believed that the parties were at impasse. Two days later, DiMatteo informed the drivers that the strike would begin on January 17. On that same day, Midwestern and River City signed an informal settlement agreement with the NLRB regarding the unfair labor practices charges stemming from the June 2, 1997, meeting between Local 836/100 and the drivers.

The strike commenced as planned, with 26 employees picketing and carrying signs declaring "On Strike, Unfair

Labor Practices." Local 215 also filed additional charges with the Board, alleging unfair labor practices surrounding Ware's statements and letters to the drivers in December 1997. Midwestern and River City then met with Smith, DiMatteo, and a federal mediator to discuss settlement of the charges, but were unable to reach an agreement. Shortly after this, Midwestern and River City signed another agreement with the NLRB remedying the unfair labor practices of both June and November-December 1997, although Local 215 was not a party to the agreement. The Board's Regional Director approved the settlement, which contained a reservation of evidence provision permitting relitigation of pre-settlement unfair labor practices for the purpose of providing background evidence to determine whether Midwestern committed other unfair labor practices.

The drivers remained on strike until March 27, when Local 215 made an unconditional offer to return to work on behalf of the drivers. But Midwestern rejected the offer by declaring the strike an economic strike and refusing to reinstate the striking drivers, which prompted Local 215 to file the unfair labor practices charges giving rise to these appeals. After an investigation, the Board's General Counsel issued a complaint alleging that Midwestern violated the NLRA by assisting and supporting Local 836/100 and recognizing it as a bargaining representative in the absence of uncoerced support of a majority of employees; using threats of discharge or discipline to coerce its employees to designate Local 836/100 as their bargaining representative and to not engage in a protected strike; and failing to reinstate the striking employees immediately upon their unconditional offer to return to work.

At the hearing before the administrative law judge ("ALJ"), the Board sought to demonstrate that the drivers were motivated to strike by the unfair labor practices

that had occurred during and after the June 1997 meeting between former Local 836 and the drivers, and by Teegarden's and Ware's later threats of termination or discipline. Drivers Fickas, Means, Chris Webster, and Robert Linendoll all testified that at the June meeting with Kinman, Teegarden told them they would lose their jobs if they did not sign the union authorization cards. The ALJ credited the testimony of each driver, although she assigned little weight to that of Means and Linendoll because neither could recall specific details of the meeting. Teegarden also testified. He admitted taking attendance at the meeting, and testified that after taking attendance he left the meeting for 45 minutes to allow Kinman to speak, and that he returned only when one of the drivers asked him to answer a question regarding what would happen if the employees refused to sign the union authorization cards. When queried about his answer, Teegarden asserted that he did not tell the employees they would lose their jobs, but rather only that by signing the cards they were voting to join the union, "or something to that effect," and that they could not lose their jobs because "Indiana is not a right-to-work state."[1] The ALJ did not fully believe Teegarden, however, because to her he seemed unsure of his testimony, and was unable after three attempts to enunciate "Indiana is not a right-to-work state," even with coaching by counsel. Ware also testified as to his negotiations with Kinman before the meeting. Ware first stated that he reduced the addendum to the Local 836-Midwestern contract to writing

---

[1] Right-to-work laws prohibit labor-management agreements from requiring union membership as a condition of employment. *E.g.*, *Retail Clerks Int'l Ass'n Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746 (1963). Indiana repealed its right-to-work statute in 1965. *See Fort Wayne Educ. Ass'n, Inc. v. Goetz*, 443 N.E.2d 364, 371 (Ind. App. Ct. 1982).

on the day of the meeting. Later, under examination by Midwestern's counsel, he testified that he negotiated the addendum with Local 836 only after Kinman faxed him the signed authorization cards. The ALJ credited Ware's first version of events over his second. Based on this testimony, the ALJ found that Midwestern had unlawfully assisted Local 836/100 in violation of 29 U.S.C. §§ 158(a)(2) and (a)(3) by negotiating with and recognizing it without any indicia of uncoerced majority support by the drivers, and by threatening the drivers with loss of their jobs if they refused to sign the union authorization cards.

On the charge that the company violated the NLRA by threatening to enforce the no-strike clause after Local 836/100 had disclaimed representation, Midwestern did not seriously dispute the NLRB's version of events, but argued instead that Ware had held an honest belief that the addendum constituted a valid contract between Midwestern and Local 836/100. The ALJ concluded that Ware had no legitimate basis to hold that view, however, finding that by the time he had expressed his belief that the agreement had been "transferred" to Local 215, he was aware that a majority of Midwestern's Boonville, Rockport, and Owensboro drivers had selected Local 215 as their bargaining representative, so that the basis for collective bargaining with Local 836/100, the recognition of the drivers' representative, was absent. The ALJ also found that Midwestern's agreement with Local 836/100 was in any event a nullity because Midwestern had negotiated and entered into it without first attempting to determine that its actions had uncoerced majority support. As a consequence, the ALJ concluded that the threats of termination or discipline at the meetings between the drivers and Teegarden and Ware and in Ware's December letters were attempts to interfere with, restrain, or coerce the drivers in the exercise of their right to choose a bargaining representative, in violation of 29 U.S.C. § 158(a)(1).

Having concluded that Midwestern committed unfair labor practices in June and November-December 1997, the ALJ then found that the NLRA violations contributed to the drivers' decision to strike. The ALJ identified as evidence of the employees' motivation the timing of the violations; the discussions of the drivers at the January 13, 1998, meeting at Local 215; the picket signs declaring that the strike was in protest of unfair labor practices; Midwestern's refusal to recognize Local 215; and Ware's threats to enforce the no-strike clause in the discredited Local 836/100 addendum. Although she recognized that frustration with the slow pace of negotiations between Midwestern and Local 215 likely played a part in the drivers' decision to strike, the ALJ nonetheless character-ized the drivers' frustration not as discontent with lack of economic resolution, but as frustration with Midwest-ern's refusal to resolve unfair labor practices. In sum, the ALJ concluded that the strike was an unfair labor prac-tices strike, and ordered the strikers immediately rein-stated with back pay. A three-member panel of the Board affirmed the order with minor modifications. *Midwestern Personnel Serv's, Inc.*, 331 N.L.R.B. No. 50 (June 21, 2000).

## II.

Now, almost two years later, the Board petitions for enforcement of its order directing reinstatement of the drivers with back pay, and Midwestern cross-petitions for review. Because there is no limitation governing the timeliness of petitions for enforcement or review of NLRB orders apart from the equitable doctrine of laches, and because the parties do not contend that these peti-tions should be barred by laches, our jurisdiction is secure. *Seafarers Int'l Union of North America, Atlantic, Gulf, Lakes, & Inland Waters Dist., AFL-CIO v. NLRB*, 895 F.2d 385, 386-87 (7th Cir. 1990). We must enforce the Board's

order if its factual findings are supported by substantial evidence in the record as a whole and its legal conclusions have a reasonable basis in law. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). "Substantial evidence" means relevant evidence that a reasonable mind might accept as adequate to support the Board's conclusions. *Multi-Ad Serv's, Inc. v. NLRB*, 255 F.3d 363, 370 (7th Cir. 2001). We may not set aside the Board's conclusions simply because we might justifiably reach different conclusions had we considered the matters *de novo. NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 260 (1968). Thus, we defer to the ALJ's findings concerning witness credibility, and we will not disturb those findings absent extraordinary circumstances such as evidence of clear bias, utter disregard of sworn testimony, or crediting of testimony that is incredible on its face. *Multi-Ad*, 255 F.3d at 370. Where two versions of the same incident materially conflict, the ALJ's credibility determinations are entitled to deference. *Id.*; *see also NLRB v. Link-Belt Co.*, 311 U.S. 584, 596-97 (1941) (a court of appeals lacks the authority to substitute its judgment for the Board's judgment based on disputed facts).

Whether a strike is characterized as an unfair labor practices strike (a strike caused or prolonged in part by an employer's unfair labor practices) or as an economic strike (a strike precipitated by the inability of labor and management to reach an agreement over wages, hours, or working conditions) is vital insofar as the remedies under the NLRA are concerned. Under Sections 8(a)(3) and (a)(2) of the NLRA, 29 U.S.C. §§ 158(a)(3), (a)(1), unfair labor practices strikers are entitled to immediate reinstatement with back pay once they unconditionally offer to return to work, whereas economic strikers may be permanently replaced. *NLRB v. Int'l Van Lines*, 409 U.S. 48, 50-51 (1972); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278 (1956); *Northern Wire Corp. v. NLRB*, 887 F.2d

1313, 1319 (7th Cir. 1989). An unfair labor practices strike does not lose its character as such if economic motives contribute to its cause, however; it remains an unfair labor practices strike so long as the employees are motivated in part by unfair labor practices. *Lapham-Hickey Steel Corp. v. NLRB*, 904 F.2d 1180, 1187 (7th Cir. 1990); *Northern Wire*, 887 F.2d at 1319; *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 235 (3d Cir. 2001); *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 839 (4th Cir. 2000). The character of the strike at issue here turns on whether Midwestern unlawfully assisted Local 836/100 by engaging in collective bargaining with and recognizing the union without first ascertaining whether an uncoerced majority of the employees had freely selected it as their bargaining representative, and by threatening employees with termination, discipline, or legal action under the purported authority of the now-discredited collective bargaining agreement between Midwestern and Local 836/100. We have little difficulty sustaining the Board's conclusions.

Cooperation between employers and labor unions is both permissible and encouraged by the NLRA. But it is an unfair labor practice when cooperation crosses the line into domination or interference with the formation or administration of a union, or contribution of financial or other support to a union, with the effect of interfering with the employees' organizational rights guaranteed by Section 7 of the NLRA, 29 U.S.C. § 157. 29 U.S.C. § 158(a)(2); *Electromation, Inc. v. NLRB*, 35 F.3d 1148, 1161-62 (7th Cir. 1994); *Farmers Energy Corp. v. NLRB*, 730 F.2d 1098, 1102 (7th Cir. 1984). Whether an employer actually intended to interfere with the employees' selection of a bargaining representative, or whether employees actually felt coerced by their employer's actions does not matter—the gravamen of the violation is whether the employer's assistance reasonably tends to coerce the

employees in the exercise of their organizational rights. *Link-Belt*, 311 U.S. at 588; *NLRB v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1313 (7th Cir. 1998); *Farmers Energy*, 730 F.2d at 1102. In determining whether management-labor cooperation has crossed over from permissible co-operation to unlawful coercion, courts consider a confluence of factors, with no one factor being dispositive. This non-exclusive list of factors includes whether the employer solicited contact with the union; the rank and position of the company's solicitor; whether the employer silently acquiesced in the union's drive for membership; whether the employer shepherded its employees to meetings with a prospective union; whether management was present at meetings between its employees and a prospective union; whether the signing of union authorization cards was coerced; and whether the employer quickly recog-nized the assisted union after the employees signed au-thorization cards yet exhibited prejudice against another union selected by the employees. *See, e.g.*, *Int'l Assoc. of Machinists, Tool & Die Makers Lodge No. 35 v. NLRB*, 311 U.S. 72, 78-79 (1940); *Farmers Energy*, 730 F.2d at 1102; *NLRB v. Vernitron Elec. Components, Inc.*, 548 F.2d 24, 26 (1st Cir. 1977); *Amalgamated Local Union 355 v. NLRB*, 481 F.2d 996 (2d Cir. 1973).

Here, the Board found that Midwestern's President, Samuel Ware, personally solicited Local 836/100 and entered into collective bargaining with it before any effort had been made to determine whether a majority of the drivers would have selected Local 836/100 as their bargaining representative. A high-ranking manager, James Teegarden, attended the meeting between Local 836/100 and the drivers. Although Teegarden was not present in the room at all times during the meeting, Teegarden took attendance, introduced the prospective union representative to the drivers, made himself avail-able to answer questions that should have been within

the union representative's ken, and suggested to the drivers that they would lose their jobs if they did not sign the authorization cards. This constitutes substantial evidence that the company was the impetus behind the recognition of Local 836/100. Any agreement between Midwestern and Local 836/100 concerning Midwestern's Indiana drivers was not a product of true collective bargaining and thus was not enforceable. *See Int'l Ladies' Garment Workers' Union, AFL-CIO v. NLRB*, 366 U.S. 731, 737 (1961). And because the agreement with Local 836/100 was unenforceable, threatening the drivers with termination or discipline under its no-strike clause was an attempt to interfere with, restrain, or coerce the employees in the exercise of their freedom to choose Local 215 as their bargaining representative, in violation of 29 U.S.C. § 158(a)(1). *See J.C. Penney Co., Inc. v. NLRB*, 123 F.3d 988, 993-94 (7th Cir. 1998); *Northern Wire*, 887 F.2d at 1317.

Midwestern argues, however, that the Board's findings cannot stand because they were based solely on "self-serving" testimony or misrepresentations provided by employees and union officials. The Board's witnesses were self-interested—substantial back pay is at stake—but it cannot be said that Midwestern's management had no interest in the outcome. We thus understand Midwestern's argument to be an attack on the ALJ's decision to credit the testimony of the drivers over that of Ware and Teegarden. Normally we defer to the Board's credibility determinations unless there is some extraordinary reason why we should ignore them, for instance if those findings are inherently incredible or patently unreasonable. *See Beverly California Corp. v. NLRB*, 253 F.3d 291, 294 (7th Cir. 2001); *Multi-Ad*, 255 F.3d at 370; *Joy Recovery*, 134 F.3d at 1312; *NLRB v. Gold Standard Enters., Inc.*, 607 F.2d 1208, 1211 (7th Cir. 1979). The ALJ credited the testimony of the employees because she found that their

testimony was largely consistent. In contrast, she did not fully credit Teegarden because he appeared coached and unsure of his testimony, and she did not credit all of Ware's testimony because he gave conflicting accounts of when he drafted the contract between Midwestern and Local 836/100, a key factor in determining whether true collective bargaining between Midwestern and Local 836/100 had occurred. We see no extraordinary circumstances warranting that we disregard the ALJ's credibility findings.

The existence of prior unfair labor practices does not mean that a subsequent strike is an unfair labor practices strike, however; a causal connection must be proved. *NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691 (7th Cir. 1976); *Ryan Iron Works, Inc. v. NLRB*, 257 F.3d 1, 8 (1st Cir. 2001); *California Acrylic Indus., Inc. v. NLRB*, 150 F.3d 1095, 1101 (9th Cir. 1998); *Pirelli Cable Corp. v. NLRB*, 141 F.3d 503, 517 (4th Cir. 1998); *Allied Mech. Serv's, Inc. v. NLRB*, 113 F.3d 623, 626 (3d Cir. 1997); *Capitol Steel & Iron Co. v. NLRB*, 89 F.3d 692, 698 (10th Cir. 1996); *Road Sprinkler Fitters Local Union No. 669 v. NLRB*, 681 F.2d 11, 20 (D.C. Cir. 1982). Midwestern contends that no causal connection is present here, first stressing that collective bargaining between it and Local 215 was at impasse shortly before the strike ensued, and that the breakdown in bargaining over questions of wages and pensions and the like was thus the real basis for the strike. But Midwestern ignores its knowledge (through Ware and Teegarden) that in November and December 1997 the drivers were contemplating a strike over Midwestern's hasty recognition of Local 836/100 and refusal to recognize Local 215, which by that time had also informed Midwestern by letter that it represented a majority of the drivers. Also, Midwestern does not seriously dispute the testimony by drivers Chris Means and Gerald Fickas that on January 13, at the meeting where the

drivers voted to strike, they and other drivers had complained to Local 215 about Teegarden and Ware's threats of termination and discipline if the drivers decided to strike for having "a local out of Ohio shoved down their throat*." See Citizens Publ'g & Printing*, 263 F.3d at 235; *Calex Corp. v. NLRB*, 144 F.3d 904, 911 (6th Cir. 1998). And that the strike did not ensue immediately after the vote does not lessen its causal impact—the drivers held off on initiating the strike at the suggestion of the union, which wanted one more opportunity to persuade Midwestern to recognize it as the drivers' bargaining representative.

Midwestern next contends that the strike could not have been caused by the prior unfair labor practices because the two prior unfair labor practices were "dead issues" by the time the strike ensued. Midwestern bases its argument on the facts that well before the strike Local 836/100 had disclaimed its interest in the drivers and that Midwestern and River City had reached an informal settlement with the NLRB of all pending unfair labor practices charges. As the Board points out, however, neither of these events prompted Midwestern to recognize Local 215 as the drivers' bargaining representative. Indeed, Midwestern continued to assert the validity of the agreement with Local 836/100 right up to the time when the drivers voted to strike.

Finally, Midwestern argues that all of the evidence upon which the Board based its finding that the strike was based on unfair labor practices was entirely self-serving and hence unreliable. For support, Midwestern relies on our decision in *Colonial Haven Nursing Home* and the Fourth Circuit's decision in *Pirelli Cable*. In *Colonial Haven*, we concluded that many of the unfair labor practices cited by the striking employees as their motivation to strike had occurred after they voted to strike, and that the violations that occurred prior to the decision to

strike were remote in time and relatively minor. 542 F.2d at 705. In this case, however, all of the unfair labor practices occurred prior to the decision to strike and were not relatively minor. *See Northern Wire*, 887 F.2d at 1321 n.3. And although the prior unfair labor practices in this case might be fairly remote in time, they were by no means "dead issues." The unlawful assistance immediately fostered discontent, which led to Local 215's organizing efforts and its October request for recognition, as well as the November and December meetings in which the drivers were threatened with termination or discipline. The basis of Midwestern's threats—its view that the Local 836/100 agreement had transferred to Local 215—played a large part in its refusal to recognize Local 215 and its declaration of impasse. In short, there is a patent causal connection present in this case that *Colonial Nursing* lacked.

*Pirelli Cable* is equally distinguishable. There, the employees initiated a strike after the company demanded economic concessions. The evidence that the strike was motivated partly by unfair labor practices was provided solely by three union officials, whose testimony strongly suggested that the unfair labor practices charges were an attempt to shield the union's members from the consequences of engaging in a economic strike. Moreover, the Board lacked evidence of the actual sentiment of the employees, and the claimed unfair labor practice was weak (indeed, the court of appeals concluded that no violation had occurred). 141 F.3d at 517-18. In contrast, there was credible evidence before the Board in this case of the employees' sentiment. There was also evidence that the drivers' decision to strike was not made only after talks between the union and the company broke down. And unlike *Pirelli Cable*, the prior unfair labor practices committed by Midwestern were substantial.

### III.

For these reasons we conclude that substantial evidence in the record as a whole supports the Board's conclusions that the strike was an unfair labor practices strike. Because an employer's refusal to reinstate unfair labor practices strikers upon their unconditional offer to return to work is itself an unfair labor practice in violation of Sections 8(a)(3) and (a)(1) of the NLRA, 29 U.S.C. §§ 158(a)(3), (a)(1), *see Lapham-Hickey Steel*, 904 F.2d at 1187; *Northern Wire*, 887 F.2d at 1319, we ENFORCE the order of the Board directing Midwestern to reinstate the striking drivers with back pay, and DENY Midwestern's petition for review.

A true Copy:

      Teste:

                            _____
                            *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*