In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-2836

NATIONAL LABOR RELATIONS BOARD,

*Petitioner,*

*v.*

MIDWESTERN PERSONNEL SERVICES, INC.,

*Respondent.*

---

On Petition for Enforcement of an Order
of the National Labor Relations Board.
Nos. 25-CA-25503-2, 25-CA-25823-3 &
25-CA-25978-5

---

ARGUED JANUARY 11, 2007—DECIDED NOVEMBER 8, 2007

---

Before BAUER, FLAUM and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* After finding that Midwestern Personnel Services, Inc. ("Midwestern") violated the National Labor Relations Act ("NLRA"), the National Labor Relations Board ("Board") ordered Midwestern to reinstate striking employees and to make each of them whole. The Board calculated the amount of back-pay Midwestern owed to each employee, and Midwestern disputed some of the findings. Midwestern also contended that it was denied due process during the compliance hearing. For the reasons stated below, we affirm the Board's findings in all respects and grant the Board's petition for enforcement of its order.

The facts of this case are set out in detail in our opinion enforcing the Board's original order regarding reinstatement and back-pay. *NLRB v. Midwestern Pers. Servs., Inc.*, 322 F.3d 969, 971-76 (7th Cir. 2003). Midwestern leased cement and transport truck drivers to various businesses from its locations in Indiana and Kentucky. The Board found that Midwestern violated Section 8(a)(1) of the NLRA, *see* 29 U.S.C. § 158(a)(1), by instructing employees to designate Chauffeurs, Teamsters, and Helpers Local Union No. 836 ("Local 836") as their collective-bargaining representative and threatening them with discharge if they did not. *See Midwestern Pers. Servs., Inc.*, 331 N.L.R.B. 348 (2000). In addition, the Board found that Midwestern violated Section 8(a)(2) of the NLRA, *see* 29 U.S.C. § 158(a)(2), by assisting and supporting Local 836 and by recognizing it in the absence of the uncoerced support of a majority of employees. Thereafter, a majority of Midwestern's employees expressed support for Chauffeurs, Teamsters, and Helpers Local Union No. 215 ("the Union") as their collective-bargaining representative. After Midwestern refused to recognize and bargain with the Union, the employees engaged in a strike.

The Board subsequently found that Midwestern violated Section 8(a)(1) of the NLRA again by threatening employees with discipline, loss of employment, and legal action if they engaged in a strike. It also found that Midwestern violated Sections 8(a)(3) and (1) of the NLRA by failing and refusing to reinstate the strikers immediately upon their unconditional offer to return to work. The Board directed Midwestern to offer reinstatement to all of the striking employees and to make each whole for any loss of earnings suffered as a result of Midwestern's unlawful conduct. We entered judgment enforcing the Board's order in full. *Midwestern*, 322 F.3d at 972.

The Board then instituted compliance proceedings to determine the amount of back-pay due and to consider

Midwestern's other contentions regarding compliance with the enforced order. *See* 29 C.F.R. §§ 102.52-102.59. The Board issued a compliance specification alleging the amount of back-pay due to twenty-six discriminatees.

The Board held a three-day hearing before an administrative law judge ("ALJ"). The ALJ determined the specific amount of back-pay due each of the strikers, considering the nature of any interim employment secured and whether the employee had engaged in a reasonably diligent job search during periods of unemployment. The ALJ found that all affected discriminatees had met this standard for the back-pay periods. The ALJ tolled back-pay for periods in which particular discriminatees were unavailable for work or employed. Midwestern filed exceptions to the ALJ's findings and conclusions. After considering Midwestern's exceptions, the Board issued its Supplemental Decision and Order affirming the ALJ's supplemental decision and adopting the ALJ's order regarding the amount of back-pay due to the twenty-six discriminatees.

Midwestern now contends that the Board's Supplemental Decision and Order should not be enforced as to eleven particular discriminatees. According to Midwestern, those eleven strikers did not satisfy their duty to mitigate their wage losses by making a reasonably diligent effort to secure interim employment, and the ALJ's findings are not supported by substantial evidence. Midwestern also argues that it was denied due process during the administrative hearing. In the administrative proceedings, Midwestern did not challenge the ALJ's findings with respect to fourteen of the twenty-six employees, and it has since conceded that one other employee, Wade Carter, made a good faith effort to secure other employment. Therefore, we summarily affirm the Board's order with respect to the fifteen employees whose back-pay awards are unchallenged, *see* 29 U.S.C. § 160(e);

*Masiongale Elec.-Mech., Inc. v. NLRB*, 323 F.3d 546, 557 (7th Cir. 2003), and address the other eleven employees in turn. For the reasons given below, we find that the factual findings made by the ALJ and the Board are supported by substantial evidence and that the order for back-pay should be enforced.

**A.**

Midwestern first argues that the Board misapplied the law when it rejected Midwestern's mitigation defense. The Board's findings on this defense, Midwestern asserts, are not supported by substantial evidence. The NLRA authorizes the Board to fashion appropriate remedial orders to correct the effects of unfair labor practices. 29 U.S.C. § 160(c). The Board may order affirmative action including reinstatement, with or without back-pay, to effectuate the NLRA's policies. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 898-99 (1984); *NLRB v. United Contractors, Inc.*, 614 F.2d 134, 136 (7th Cir. 1980). The Board's exercise of its discretion in formulating such remedies is subject to only limited judicial review. *See Fibreboard Corp. v. NLRB*, 379 U.S. 203, 216 (1964); *J. Huizinga Cartage Co. v. NLRB*, 941 F.2d 616, 622 (7th Cir. 1991). We will affirm and enforce the Board's findings if they are supported by substantial evidence and if the Board's conclusions have a reasonable basis in law. *FedEx Freight E., Inc. v. NLRB*, 431 F.3d 1019, 1025 (7th Cir. 2005); *Del Rey Tortilleria, Inc. v. NLRB*, 976 F.2d 1115, 1118 (7th Cir. 1992). The substantial evidence test "requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree that *could* satisfy the reasonable fact finder." *FedEx*, 431 F.3d at 1025-26 (*quoting ATC Vancom of Cal. v. NLRB*, 370 F.3d 692, 695 (7th Cir. 2004)) (emphasis in original).

Discriminatees are required to mitigate their damages by seeking interim employment after an unlawful discharge. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 198-200 (1941). However, discriminatees are only required to make an "honest good faith effort" to seek other employment. *Golay & Co. v. NLRB*, 447 F.2d 290, 295 (7th Cir. 1971); *NLRB v. Int'l. Bhd. of Elec. Workers*, 992 F.2d 990, 993 (9th Cir. 1993). And discriminatees need only follow their customary method for obtaining work, and need only seek interim employment that is "substantially equivalent" to their previous positions. *Ferguson Elec. Co.*, 330 N.L.R.B. 514, 518 (2000), *overruled in irrelevant part by Oil Capitol Sheet Metal, Inc.*, No. 17-CA-19714, 2007 N.L.R.B. LEXIS 203 (May 31, 2007). Midwestern has the burden of demonstrating that the challenged employees were not making adequate efforts to mitigate their damages by securing other employment. *See Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1203 n.3 (7th Cir. 1989); *Sprogis v. United Airlines, Inc.*, 517 F.2d 387, 392 (7th Cir. 1975). Moreover, the finding of an unfair labor practice is presumptive proof that some back-pay is owed. *NLRB v. NHE/Freeway, Inc.*, 545 F.2d 592, 593 (7th Cir. 1976).

The discriminatees commenced an unfair labor practices strike on January 17, 1998. The back-pay period began on March 27, 1998, when the Union made an unconditional offer to return to work on behalf of the strikers, and Midwestern refused to reinstate them. The back-pay period ended on December 31, 1999, when Midwestern ceased doing business in the area.

### 1. Henry Langdon

Midwestern contends that Langdon failed to mitigate his damages throughout the entire back-pay period and therefore is not entitled to any back-pay. Midwestern

asserts that Langdon relied solely on the Union's looking-for-work list, which provided him with only brief and sporadic employment opportunities.

Most of the discriminatees used the Union's looking-for-work list as a way of finding other employment during the back-pay period. The Union provided listings of available opportunities to work as truck drivers in the construction industry. In order to use the list, the discriminatees were required to sign the list at least every 30 days.

Immediately after Midwestern refused to reinstate Langdon, he signed onto the list. He secured six jobs in 1998 through the list, one of which lasted six months. The record also shows that Langdon did not rely solely on the Union's list. Langdon did seek and obtained other work on his own, including one job that was more difficult than the one he held while employed by Midwestern because it required prolonged periods away from home. *See Kawasaki Motors Mfg. Corp. v. NLRB*, 850 F.2d 524, 528 (9th Cir. 1988) (stating that discriminatee need only seek employment "substantially equivalent to" former job and is not required to "seek or retain a job more onerous than the job from which he or she was discharged"). Langdon also registered with the Indiana unemployment agency, and registering with a state unemployment agency is prima facie evidence of a reasonable job search. *See Golay*, 447 F.2d at 295; *Allegheny Graphics*, 320 N.L.R.B. 1141, 1145 (1996). Ultimately, however, work obtained through the Union's list provided sufficient employment for Langdon and several other discriminatees throughout the back-pay period. The Board has held that seeking employment through a union's referral system may constitute a reasonably diligent search. *See Big Three Indus. Gas & Equip. Co.*, 263 N.L.R.B. 1189, 1198 (1982). Therefore, substantial evidence supports the Board's finding that Langdon was

reasonably diligent in his efforts to mitigate his wage losses.

### 2.  *Gregory Harris*

Midwestern claims that Harris also did not attempt to seek employment except through the Union list during the fourth quarter of 1998 and the first quarter of 1999 and is thus not entitled to any back-pay during this time. Midwestern also asserts that Harris is not entitled to back-pay following his employment at DMI Furniture, which he voluntarily quit during the second quarter of 1999.

Harris, like Langdon, sought and obtained work from the Union's list, as well as other sources, throughout the back-pay period. Harris applied for jobs he found on his own, through friends, and with the help of the Indiana unemployment agency's veteran's assistance program. The job he left required him to cut timber, which was more dangerous than the position he held at Midwestern. *See Kawasaki*, 850 F.2d at 529. Substantial evidence therefore supports the finding that Harris fulfilled his duty to mitigate damages.

### 3.  *Randy Leinenbach*

Midwestern asserts that Leinenback failed to mitigate his damages throughout the back-pay period and is therefore entitled to no back-pay. Midwestern also challenges Leinenbach's lack of response to its recall offer. Leinenbach applied for work through the state unemployment office and independently made other applications throughout the back-pay period. Leinenbach personally asked the owners of several small trucking companies on numerous occasions for a job as a driver. He also was

self-employed, detailing trucks, and in 1999, working for his parents' company in the same capacity. The fact that Leinenbach initially was unsuccessful at obtaining work does not establish that he failed to conduct a search with reasonable diligence, *see Chem Fab Corp*, 275 N.L.R.B. 21, 21 (1985), and Midwestern has submitted no evidence to show that Leinenbach failed to seek employment adequately. *See NLRB v. Mastro Plastics Corp.*, 354 F.2d 170, 179 (2d Cir. 1965) ("Unless in taking substantially equivalent or self-employment the discriminatee willfully forewent greater earnings, his back pay should not be reduced beyond the interim earnings he in fact received."). Finally, Leinenbach was not obliged to respond to Midwestern's recall offer because the undisputed finding of the Board was that the position offered was not equivalent to his previous one. *See Clean Soils, Inc.*, 317 N.L.R.B. 99, 110 (1995). Thus, substantial evidence supports the Board's findings as to Leinenbach.

### 4.   Scott Taylor

Midwestern asserts that Taylor did not mitigate his damages during a six-month period during the fall quarter of 1998 and the first quarter of 1999, and that he was unable to identify any job search he made during this time. The record does not bear Midwestern out. Taylor recalled eight specific employers to whom he applied, either on his own or through the Indiana unemployment agency, during the relevant six-month period—a difficult season for construction work. *See Local 3, IBEW*, 315 N.L.R.B. 1266, 1266 (1995) ("The sufficiency of a discriminatee's efforts to mitigate back-pay are determined with respect to the back-pay period as a whole and not based on isolated portions of the back-pay period."). In addition, he obtained a position with Sterling Boilers during this time. In the second quarter of 1999, Taylor secured

employment with Concrete Supply and continued to work there throughout the remainder of the back-pay period. Substantial evidence therefore supports the finding that Taylor made a reasonably diligent search for employment.

### 5. *Randall Underhill*

Midwestern contends that Underhill is not entitled to any back-pay for the second, third, and fourth quarters of 1999 after he turned down its offer to work at the Owensboro plant. Underhill explained that he declined the position because he lacked access to transportation. Midwestern asserts that this explanation establishes that Underhill had removed himself from the job market at that time.

As the Board found, Midwestern's offer was not a valid offer of reinstatement. Midwestern's letter offered employment only at the Owensboro plant, but Underhill had previously worked at the Boonville plant, which was within walking distance of his home. The offer also would require that Underhill work at a lower rate of pay with no seniority and no insurance. Therefore, the position was not substantially equivalent to the one Underhill held before the strike, and Underhill was under no obligation to accept it. *See Clean Soils*, 317 N.L.R.B. at 110. Moreover, Underhill did continue to seek other employment throughout the challenged period, and successfully found work with one employer at that time. Substantial evidence supports the Board's award to Underhill.

### 6. *David Wyatt*

Midwestern contends that Wyatt failed to mitigate his damages throughout all four quarters of 1999. Midwestern asserts that Wyatt relied only on the Union list for that

period and in addition failed to accept its offer of reinstatement in the second quarter of 1999. The record demonstrates, however, that Wyatt sought work through the Union list, the Indiana unemployment agency, and his own job applications. Wyatt specifically recalled the names of ten employers where he sought work. Finally, Midwestern's offer of reinstatement did not offer Wyatt substantially equivalent employment; therefore Wyatt was not obliged to accept it, and substantial evidence supports the Board's findings.

### 7.  Gerald Fickas

Midwestern claims that Fickas failed to mitigate his damages during the second, third, and fourth quarters of 1998 and the first quarter of 1999. Again, the record does not support Midwestern's claim. Fickas searched for work through the Union's list, friends, and want ads in the local newspaper. He submitted at least one application on his own before the Union referred him to a job that he accepted with D. J. Transportation. When work dried up there, Fickas went to work for J. H. Rudolph. Fickas was subsequently laid off during the rainy season; he returned to D. J. Transportation and worked for that company until he was recalled by J. H. Rudolph. These efforts demonstrate reasonable diligence and support the Board's ruling.

### 8.  Robert Linendoll

Midwestern contends that Linendoll removed himself from the job market in the fourth quarter of 1998 because he did not remain on the Union list, and as a result is not entitled to back-pay for that quarter. However, the record shows that Linendoll did continue to seek employment through the Union's list and on his own, and in

fact worked two different jobs during this time. Contrary to Midwestern's claim, Linendoll did remain in contact with the Union during the period he was seeking employment. The one exception is for a three-week vacation which Linendoll took, and the Board subtracted from his back-pay award to account for this. Thus, substantial evidence supports the Board's findings.

### 9. Christopher Pentecost

Midwestern claims that Pentecost failed to mitigate his damages during the entire back-pay period. The record does not support Midwestern's assertion and instead reveals that Pentecost successfully obtained jobs through the Union's list, as well as on his own and with the help of relatives, all while working other menial jobs, including trash collecting at farms. He also registered with the state unemployment agency and looked for work from other union halls. *See Amshu Assocs., Inc.*, 234 N.L.R.B. 791, 794 (1978) (discriminatee made reasonably diligent search for work where he consulted friends, relatives, associates; contacted local union; registered with state unemployment agency; responded to help wanted ads). This evidence supports the Board's finding that Pentecost exercised reasonable diligence.

### 10. Gary Williams

Midwestern claims that Williams failed to mitigate his damages during the entire back-pay period. Midwestern argues that because Williams only sought work outside the trucking industry, earning less than what he made working for Midwestern, it should not be required to make up the difference. The record shows that Williams continued to work as a truck driver during the back-pay period and took lower-paying positions only when he failed

to find better work. Moreover, he never stopped looking for higher-paying positions and switched jobs to obtain higher wages. In any event, the Board has established that an employee "who accepts appropriate employment at lower pay is not required to search for a better job." *Tilden Arms Mgmt. Co.,* 307 N.L.R.B. 13, 15 (1992); *see also Sioux Falls Stock Yards*, 236 N.L.R.B. 543, 570 (1978). The evidence supports the Board's decision regarding Williams.

### 11. Timothy Cronin

Midwestern argues that Cronin voluntarily quit his employment at J. H. Rudolph in the third quarter of 1998 and is not entitled to any back-pay for the period thereafter. However, the record shows that Cronin was frustrated working for J. H. Rudolph because changes in weather meant that the quantity of work he was able to obtain fluctuated drastically. Cronin quit his job to pursue steadier work closer to home, where he was guaranteed a forty-hour work week. He continued to seek other work while employed, and eventually found a job that paid him a higher wage. This evidence provided adequate support for the Board's award to Cronin.

### B.

Midwestern next contends that the ALJ and the Board deprived it of administrative due process by refusing to allow it to present evidence relevant to the mitigation issue. Midwestern complains that the ALJ unreasonably restricted testimony by its expert witness, Dr. Malcolm Cohen, not allowing it to expand upon his written report.

Midwestern introduced evidence by its expert to show that work was plentiful in Indiana and Kentucky,

and therefore the challenged discriminatees failed to exercise reasonable diligence in seeking work. The ALJ cut short Cohen's testimony at the compliance hearing when it appeared that he would offer no testimony that did not simply echo the findings in his report. The Board found that Midwestern failed to show that Cohen could have provided probative testimony beyond the contents of his report.

Our review of the record convinces us that the ALJ was well within his discretion to limit the testimony as cumulative. *See Tuf-Flex Glass v. NLRB*, 715 F.2d 291, 298 (7th Cir. 1983). The transcript of the compliance hearing demonstrates that Midwestern had ample opportunity to question Cohen concerning any probative evidence not contained in his report. It is unclear even from Midwestern's proffer of further testimony what Cohen could have said that would be relevant to the issues at hand. For example, the data collected was statewide, and thus the report did not provide specific data for the relevant geographical areas. In addition, Cohen's analysis did not include any data regarding the pool of applicants, any insight into whether the discriminatees would have been able to secure positions had they applied, or any information regarding the hours, wages, and locations of the supposedly available positions. In general, it is reasonable for the Board to reject expert testimony regarding generalized labor market analysis as evidence that particular discriminatees failed to perform a reasonably diligent search. *See UFCW, Local 1357*, 301 N.L.R.B. 617, 621 (1991); *Delta Data Sys. Corp.*, 293 N.L.R.B. 736, 737 (1989). Finally, Midwestern has not shown that it was prejudiced by the exclusion of the expert's testimony. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (remand not necessary "unless there is reason to believe that the remand might lead to a different result").

For the foregoing reasons, we conclude that the ALJ's findings and decision, as adopted and modified by the Board, are supported by substantial evidence. The Board's petition for enforcement of its order is GRANTED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*