**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-3411 & 10-3546
_____

NATIONAL LABOR RELATIONS BOARD,

Petitioner

v.

ST. GEORGE WAREHOUSE, INC.,

Respondent
_____

ST. GEORGE WAREHOUSE, INC.,

Petitioner

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent
_____

On Application for Enforcement of an Order of the
National Labor Relations Board &

1

Cross-Petition for Review
Case Nos. 22-CA-23223, 22-CA-23259 & 22-CA-23270
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 23, 2011

Before: MCKEE, <u>Chief Judge</u>, SCIRICA and GARTH,
<u>Circuit Judges</u>

(Opinion filed: June 23, 2011)

Richard A. Cohen, Esq.
Fred B. Jacob, Esq.
Linda Dreeben, Esq.
National Labor Relations Board
1099 14th Street, NW
Washington, D.C. 20570
 <u>Counsel for Petitioner/Cross- Respondent the National</u>
<u>Labor Relations Board</u>

John A. Craner, Esq.
Craner, Satkin, Scheer & Schwartz, P.C.
320 Park Avenue
Scotch Plains, NJ 07076
 <u>Counsel for Respondent/Cross-Petitioner St. George</u>
<u>Warehouse, Inc.</u>

_____

OPINION OF THE COURT
_____

GARTH, Circuit Judge.

The National Labor Relations Board (Board) applies to this Court to enforce, and St. George Warehouse, Inc., (St. George) cross-petitions this Court to review, an order awarding backpay to two former St. George employees who were terminated for unlawfully discriminatory reasons. St. George argues that General Counsel for the Board did not meet its burden of producing evidence as to the reasonableness of the discriminatees' post-termination efforts to seek employment. Because we conclude that there was substantial evidence to support the Board's findings concerning mitigation, we will enforce the Board's order awarding backpay and deny the cross-petition for review.

I.

In March 1999, St. George discharged forklift-operator Leonard Sides and warehouseman Jesus "Jesse" Tharp. Sides and Tharp appealed their respective discharges to an ALJ. The ALJ ordered St. George to reinstate Sides and Tharp and make them whole for their losses, concluding that they had been subject to surveillance and discharged discriminatorily by St. George on account of their involvement in a union. In a June 23, 2000, decision and order, the Board affirmed the ALJ's findings and conclusions, and adopted the ALJ's order as modified. 331 N.L.R.B. 454 (2000). We thereupon enforced the Board's order on April 23, 2001. 261 F.3d 493 (3d Cir. 2001). Our judgment was later amended on June 5, 2001.

Sides and Tharp were offered reinstatement on September 1, 2000, but both declined. As a consequence, each was entitled to receive backpay from the date of his discharge (March 31, 1999, for Sides; March 16, 1999, for Tharp) until September 1, 2000. St. George calculated the backpay it owed for that period as $6,618.40 to Sides and $8,302.02 to Tharp, and paid each accordingly.

On May 28, 2002, the Regional Director of the Board issued a Compliance Specification and Notice of Hearing,[1] which estimated additional amounts of backpay due to Sides and Tharp. At the subsequent compliance (backpay) hearing on October 8, 2002, neither Tharp nor Sides testified, and General Counsel,[2] who represented the discriminatees, did not

[1] The Regional Director is the Board agent responsible for issuing "a compliance specification in the name of the Board" 1) when "it appears that controversy exists with respect to compliance with an order of the Board which cannot be resolved without a formal proceeding," or 2) "[w]henever the Regional Director deems it necessary in order to effectuate the purposes and policies of the [NLRA] or to avoid unnecessary costs or delay." 29 C.F.R. § 102.54(a) & (b). "With respect to allegations concerning the amount of backpay due," the compliance specification must "specifically and in detail show, for each employee, the backpay periods broken down by calendar quarters, the specific figures and basis of computation of gross backpay and interim earnings, the expenses for each quarter, the net backpay due, and any other pertinent information." Id. § 102.55(a).

[2] The General Counsel of the Board "exercise[s] general supervision over all attorneys employed by the Board

4

call any witnesses. St. George called a vocational expert, Donna Flannery, to testify that neither Sides nor Tharp had adequately sought to mitigate damages by exercising reasonable diligence in seeking interim employment. Flannery asserted that, based on employment statistics and newspaper advertisements, there were a substantial number of comparable jobs available to Tharp and Sides during their respective backpay periods. However, she admitted that she had not interviewed either of them.

In an October 30, 2002, Supplemental Decision, the ALJ noted in her analysis that the burden of establishing that Sides and Tharp had failed to mitigate their damages rested exclusively with St. George, and did not shift back to General Counsel at any point. The ALJ found that St. George did not meet its burden of proving that Sides and Tharp had failed to exercise diligence in finding new work. As a consequence, the ALJ recommended that each be given additional backpay in the amounts of $26,447.90 to Sides and $14,649.79 to Tharp.

Nearly five years later, on September 30, 2007, the Board issued a Supplemental Decision and Order remanding

. . . and over the officers and employees in the regional offices," as well as "final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under [29 U.S.C. § 160], and in respect of the prosecution of such complaints before the Board." 29 U.S.C. § 153(d). In investigating and prosecuting unfair-labor complaints, the General Counsel acts independently of the Board. See NLRB v. Fed. Labor Relations Auth., 613 F.3d 275, 280 (D.C. Cir. 2010).

this matter to the ALJ. The Board articulated a new standard of proof for backpay hearings: while employers would continue to bear the burden of persuasion as to an employee's alleged failure to engage in a reasonable search for new work, as well as the burden of producing evidence that there were substantially equivalent jobs within the relevant geographic area, General Counsel and the employee would now have the burden of producing evidence that the employee took reasonable steps to pursue those jobs. 351 N.L.R.B. 961, 961 (2007). In applying that new burden-shifting framework to the facts of this case, the Board concluded that St. George had produced evidence of substantially equivalent jobs within the area, but that General Counsel had not met its burden of production as to the employees' reasonable diligence to mitigate. As a result, the Board remanded to the ALJ to reopen the record to allow the parties to present evidence consistent with the revised burden of production, as declared by the Board.

## A.

Remand hearings were held before a new ALJ on February 26 and March 14, 2008. With respect to Sides's claim for backpay, General Counsel called Sides and Salvatore LoSauro, supervisor for the records unit at the New Jersey Department of Labor Employment Service (NJDOL) Employment Service, as witnesses. Sides testified that after being discharged from St. George, where he had worked for one-and-a-half years, he went to a New Jersey unemployment office and filed for benefits on April 18, 1999. On April 29, 1999, Sides registered at the veterans unit of the NJDOL Employment Service for help in returning to the workforce. On May 7, 1999, Sides was found eligible for unemployment

6

benefits, and received his first unemployment check on June 1, 1999.

Sides also testified that between March 1999 and October 2000, he reviewed job listings in newspapers, primarily the Sunday Star Ledger. Sides did not own a car, and thus, his job search was restricted to positions within twenty-five miles of his home and within walking distance (about a mile) of public transportation. He also inquired about potential openings through friends and associates.

Sides found temporary work at two temporary staffing agencies, Labor Ready and J & J Staffing Resources, Inc. At Labor Ready, Sides stocked shelves from October 25, 1999 to November 26, 1999. At J & J, Sides unloaded tractor-trailers three to five days a week from November or December 1999 until March 12, 2000. Even as he worked in his temporary position at J & J, Sides continued to seek out long-term employment.

Sides kept records documenting his work search, which were admitted into evidence. Those records indicate that from March 1999 through August 2000, Sides applied to at least thirty-three positions (including Labor Ready and J & J), eight of which (from May 3 to September 30, 1999) were referred to him by the Unemployment Office. He also took a one-day forklift-certification class at the NJDOL in September 2009, and that he called a number of other employers to determine whether their businesses were located in an accessible area, but did not make a list of those employers because he had not been instructed to do so.

On the other hand, St. George produced evidence that on October 3, 2002, it had written to sixteen of the employers listed by Sides in order to verify his records. While most employers did not respond, or replied that they did not keep such information on file, four responded that they specifically did not have an application from Sides on file, and one confirmed that Sides had applied. In addition, General Counsel produced employers' verifications of four other applications that Sides had submitted.

LoSauro testified that he first spoke with Sides on April 29, 2009, when Sides was interviewed by the NJDOL about his experience and qualifications, and NJDOL gave Sides an assessment of his employment prospects. LoSauro characterized Sides as "a very active job searcher," and testified that NJDOL had given Sides eight job referrals between May and September 2009. LoSauro also explained that verifications of applications are difficult to produce because few employers complete Job Bank Employer Reference forms, and those which are returned to the NJDOL are destroyed soon after.

B.

With respect to Tharp's claim for backpay, General Counsel called Gail Moskus, Tharp's mother, as well as Collette Sarro, a regional compliance officer with the Board. Tharp had died before the proceeding began, and thus, was unavailable to testify.

According to the documentation that General Counsel entered into evidence, Tharp was discharged by St. George on March 16, 1999, after working there for approximately six

8

years. He applied for unemployment benefits the following day. On his application for benefits, he certified that he was "ready, willing, and able to work full time" and would be able to begin work "at once." He received benefits from May 1, 1999, until June 26, 1999. Most records of Tharp's job search were unavailable, but on a Board backpay-claim questionnaire Tharp had completed in June 1999, he listed seven employers to whom he had applied unsuccessfully between June 24 and June 28, 1999.

After Tharp was discharged, he spoke with Moskus on the phone twice a month. Based on those conversions, Moskus testified that Tharp had looked for work "every day" in New Jersey for about four months, but he became "very discouraged because he couldn't find work." Then, in mid-September 1999, Tharp moved to Naples, Florida. Collette Sarro's testimony confirmed that prior to moving to Florida, Tharp called her to tell her that he was relocating because "he couldn't find a job and couldn't afford to pay his rent."

Moskus also testified that about two weeks after Tharp arrived in Florida, he began looking for forklift-driver and warehouse positions in the area. He searched for jobs by making phone inquiries, scanning newspaper listings, and having Moskus drive him to businesses to fill out applications. (Tharp did not own a car in New Jersey or Florida.) From September to October 1999, Tharp applied for jobs with at least three Florida employers. On October 19, 1999, he accepted a job offer to work as a yardman and forklift operator for Naples Lumber, which, among the jobs he applied for, was the closest in salary and description to his position with St. George. Tharp held that position with Naples Lumber through September 1, 2000.

C.

In a Second Supplemental Decision dated May 20, 2008, the ALJ credited Sides's and Moskus's testimonies and determined that, based on the evidenced introduced by General Counsel, both Sides and Tharp had made diligent, reasonable efforts to find new work. Accordingly, the ALJ recommended an order awarding them the backpay amounts ordered by the first ALJ in the October 30, 2002, Supplemental Decision -- i.e., $26,447.90 for Sides and $14,646.79 for Tharp (now Tharp's estate). A two-member quorum of the Board affirmed the ALJ's rulings, findings, and conclusions, and adopted the recommended order. 353 N.L.R.B. No. 50 (2008).

St. George petitioned this Court to review the Board's order, and General Counsel cross-petitioned for enforcement. While the petitions were pending, the Supreme Court decided New Process Steel, L.P. v. NLRB, holding that section 3(b) of the NLRA "requires that a delegee group maintain a membership of three in order to exercise the delegated authority of the Board." 130 S.Ct. 2635, 2644 (2010). Since the Board's order in this case had been entered by a two-member panel, we vacated the Board's order in light of New Process Steel and remanded to the Board for further proceedings. 394 F.App'x 902, 903 (3d Cir. 2010). We also dismissed General Counsel's cross-petition for enforcement as moot.

On remand, a three-member panel of the Board affirmed the ALJ's May 20, 2008, rulings, findings, and

conclusions, and adopted the ALJ's recommended order. 355 N.L.R.B. No. 81 (2010).

General Counsel again applies to this Court for enforcement of the Board's order, and St. George cross-petitions this Court for review of same.

II.

The Board had jurisdiction over the case pursuant to the National Labor Relations Act (NLRA), 29 U.S.C. § 160(a)-(c). We have jurisdiction over the Board's final order pursuant to 29 U.S.C. § 160(e) & (f).

On appeal from a Board order awarding backpay, the Board's findings of fact "will be upheld unless the record, considered as a whole, shows no substantial evidence to support those findings." Atl. Limousine, Inc., v. NLRB, 243 F.3d 711, 715 (3d Cir. 2001) (citing 88 Transit Lines, Inc. v. NLRB, 55 F.3d 823, 825 (3d Cir. 1995)). Substantial evidence means "evidence that a reasonable mind would accept as adequate to support an agency's conclusion." Id. at 718 (citation omitted).

The Board's determinations on questions of law are subject to plenary review, but with "due deference to the Board's expertise in labor matters." Id. at 715 (citing 88 Transit, 55 F.3d at 825). A backpay order will not be disturbed "'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" 88 Transit, 55 F.3d at 825 (quoting Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 216 (1964)).

The ALJ's credibility determinations, which the Board here affirmed, "'should not be reversed unless inherently incredible or patently unreasonable.'" Atl. Limousine, 243 F.3d at 718-19 (quoting NLRB v. Lee Hotel Corp., 13 F.3d 1347, 1351 (9th Cir. 1994)).

## III.

### A.

When the Board determines that an employee has been subjected to an unfair labor practice, it has broad discretion to fashion a back pay order that effectuates the policies underlying the NLRA. Fibreboard, 379 U.S. 215 (citing 29 U.S.C. § 160(c)). Requiring an employer to make the employee whole through back pay serves "a two-fold objective": (1) "the back pay reimburses the innocent employee for the actual losses which he has suffered as a direct result of the employer's improper conduct," and (2) it "furthers the public interest advanced by the deterrence of such illegal acts." NLRB v. Madison Courier, Inc., 472 F.2d 1307, 1316 (D.C. Cir. 1972).

### B.

St. George challenges the backpay award to Sides, arguing that: 1) based on the evidence produced by General Counsel, Sides's search for employment did not meet the reasonable diligence standard; and 2) Sides's backpay should be tolled for the periods in which he did not apply for jobs. Therefore, St. George asserts, the backpay it has already given Sides fully discharged its duty to make Sides whole.

St .George argues that a discriminatee's singular reliance on unemployment office referrals is insufficient to satisfy the reasonable diligence standard. See NLRB v. Arduini Mfg. Corp., 394 F.2d 420, 424 (1st Cir. 1968); NLRB v. Puch & Barr, Inc., 207 F.2d 409, 10 (4th Cir. 1953). However, it is well-established in Board case law that "[r]egistration with a state unemployment office is prima facie evidence of a reasonable search for employment." Church Homes, Inc., 349 N.L.R.B. 829, 834 (2007); see also, e.g., Allegheny Graphics, Inc., 320 N.L.R.B. 1141, 1145 (1996), enforced, 113 F.3d 845 (8th Cir. 1997); Firestone Synthetic Fibers, 207 N.L.R.B. 810, 812 (1973); accord NLRB v. Midwestern Personnel Servs., Inc., 508 F.3d 418, 424 (7th Cir. 2007). Sides's registration with the New Jersey unemployment office therefore reflects favorably on his efforts to mitigate.

Moreover, by suggesting that Sides's search was limited to job referrals from the unemployment office, St. George understates the extent of Sides's efforts to find interim employment. Sides testified that, in addition to visiting the unemployment office approximately each week from May 1999 to September 1999, he consulted job listings in the newspaper at least every weekend, visited employers, and asked friends to inquire about job openings on his behalf; he independently applied for two openings he had found in the newspaper between March 1999 and October 1999; he registered with the NJDOL and, as LoSauro testified, was "very active" in soliciting that office's assistance in procuring new employment; and he became certified as a forklift operator in September 1999 to enhance his marketable skills. Those combined efforts are consistent with reasonable

13

diligence.  See, e.g., Midwestern Personnel, 508 F.3d at 425-26 (holding that employee who put name on union's looking-for-work list, searched for work through friends, reviewed want ads in local newspaper, and submitted one application on his own before obtaining referral through union had conducted reasonable search); Canova v. NLRB, 708 F.2d 1498, 1506 (9th Cir. 1983) (holding that workers who placed their names with state unemployment office and on union out-of-work list, visited and applied to local employers, and looked through newspaper ads had diligently sought interim employment).

Furthermore, from October 1999 to May 2000, Sides found employment with two temporary staffing agencies: Labor Ready, from October 25, 1999, to November 26, 1999, and J & J, from November or December 1999 to March 12, 2000.  Even while working for J & J, Sides applied for long-term jobs with eight other employers, which speaks to the sincerity of his search.  See Allegheny Graphics, 320 N.L.R.B. at 1145 (concluding that efforts of discriminatee, who "applied for unemployment benefits, sought permanent employment, and continued to seek such employment even after he was hired by a temporary agency," were reasonable, as distinct from discriminatee who did not file for unemployment and only sought temporary positions).  After his job through J & J expired, Sides applied to thirteen positions over the next four-and-a-half months, and received a job offer in August 2000 to begin working in September 2000.  Sides's procurement of temporary work, his continued search for permanent work even while employed temporarily, and his subsequent efforts to find a job once his temporary positions expired evince a reasonably diligent effort to locate employment.  See Midwestern Personnel, 508 F.3d at 425

14

(concluding that employee who applied to eight employers during six-month period, and found temporary work with one, exercised reasonable diligence during that period).

St. George also argues that Sides unduly circumscribed the scope of his search to a limited geographic area.  But the fact that Sides only considered applying to jobs within twenty-five miles from his home -- the same distance that St. George had been -- and within a mile from public transportation does not render his search any less reasonable.  See, e.g., NLRB v. Westin Hotel, 758 F.2d 1126, 1130 (6th Cir. 1985) (determining employee acted reasonably in choosing not to apply for available positions twenty-five miles away from home because she did not have adequate transportation); Church Homes, 349 N.L.R.B. at 833 n.9 ("Discriminatees are not required to accept employment where they would encounter transportation difficulties due to the location of the employment opportunity."); Am. Bottling Co., 116 N.L.R.B. 1303, 1304 n.5 (1956) (concluding discriminatees acted reasonably by declining to seek jobs in area "at least from 9 to 30 miles" from their former employment, in light of "burdensome transportation problems" it would pose).  Inasmuch as "an employee need not seek employment 'which involves conditions that are substantially more onerous than [her] previous position,'" Sides was not obligated to look for jobs substantially further than St. George was from his home.  Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 89 (3d Cir. 2009) (quoting Madison Courier, 472 F.2d at 1320-21).

Finally, St. George asserts that, at a minimum, Sides's backpay should be tolled for several periods -- some two- and three-weeks long -- during which he did not submit any

applications.  However, St. George improperly asks this court to view certain periods of inactivity in a vacuum rather than scrutinize Sides's efforts holistically.  The demand for reasonable diligence does not necessarily oblige a discriminatee to undertake a daily search for employment; rather, "'[t]he sufficiency of a discriminatee's efforts to mitigate back-pay are determined with respect to the back-pay period as a whole and not based on isolated portions of the back-pay period.'"  Midwestern Personnel, 508 F.3d at 425 (quoting Local 3, IBEW, 315 N.L.R.B. 1266, 1266 (1995)); accord Kawasaki Motors Mfg. Corp., USA v. NLRB, 850 F.2d 524, 527 (9th Cir. 1988).

Taken as a whole, Sides's registration with two government agencies, his frequent searches for job openings through friends and newspaper listings, his submission of applications to thirty-three employers, and his procurement of two temporary positions, demonstrate Sides's "'honest good faith effort' . . . consistent with the inclination to work and to be self-supporting," which satisfies us as reasonable diligence.  Kawasaki, 850 F.2d at 527 (citation omitted).  We find substantial evidence to support the Board's conclusion that General Counsel satisfied its burden of production with respect to Sides's efforts to mitigate.

## C.

In its objections to Tharp's backpay award, St. George primarily faults the Board's acceptance of Moskus's testimony, which St. George alleges consisted exclusively of inadmissible hearsay. Moskus's testimony was the only evidence that General Counsel produced of Tharp's job search in Florida.  That testimony was also significant for

16

expatiating on Tharp's earlier pursuit of employment in New Jersey.

Section 10(b) of the NLRA, as codified at 29 U.S.C. § 160(b), provides that Board proceedings "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States." Based on that provision, some courts have concluded that even if a discriminatee is unavailable to testify in a Board proceeding by reason of death, his extra-judicial statements are inadmissible hearsay. See NLRB v. United Sanitation Serv., 737 F.2d 936, 940 (11th Cir. 1984); Cent. Freight Lines, Inc. v. NLRB, 653 F.2d 1023, 1026 (5th Cir. 1981).

However, we have recognized the Board's power to construe the rules of evidence liberally. In NLRB v. Louton, Inc., we held that "[t]he conduct of a backpay proceeding and the application of the evidentiary rules lie within the discretion of the administrative judge," and, moreover, "the party claiming injury from the alleged error must show that it suffered prejudice as a result of the ruling, in order for the Board's order to be reversed." 822 F.2d 412, 416 (3d Cir. 1987) (citations and internal quotation marks omitted); see also, e.g., Carpenter Sprinkler Corp. v. NLRB, 605 F.2d 60, 66 (2d Cir. 1979) (concluding that since "the Board is not required to observe automatically all the rules of evidence governing the trial of cases in court," it was entitled to create a new evidentiary rule); NLRB v. W. B. Jones Lumber Co., 245 F.2d 388, 392 (9th Cir. 1957) (holding that "[t]he Board is not required to observe the legal rules of evidence as are common law courts," and thus, "the evidence offered was admissible even though it may have involved hearsay"). The appropriate inquiry "is whether the relaxation of the Federal

Rules of Evidence by the administrative law judge was reasonable under the circumstances and limited in its application to the practicalities of th[e] situation." Conley v. NLRB, 520 F.3d 629, 640 (6th Cir. 2008) (affirming decision to admit witness's extra-judicial affidavits, even though they partially contradicted witness's testimony and consisted of hearsay, in order to ensure important evidence was not suppressed).

The evidentiary issues posed here mirror those addressed by the Second Circuit in NLRB v. Mastro Plastics Corp., 354 F.2d 170 (2d Cir. 1965). In Mastro, the relatives of two deceased discriminatees had testified as to the discriminatees' diligent searches for work. The Second Circuit held that such testimony was properly admitted:

> Even if the testimony here received would be inadmissible hearsay in a civil action, we are not prepared to require the Board to exclude it from a back pay hearing. As the discriminatee could not be produced, the Board could accept other evidence which tended to establish the facts. Here, the evidence was testimony as to the deceased's discussions of his search for alternative work. We do not consider it 'practicable,' as that word is used in Section 10(b), to exclude this relevant testimony. Moreover, since the burden of proving lack

18

of a diligent search was on [the employer], we fail to see how the admission of this testimony was prejudicial. . . . [T]he Board can only be expected to make available for the employer's cross-examination such evidence as it may reasonably obtain.

Mastro, 354 F.2d at 179.

We conclude that the Board's affirmance of the ALJ's decision to allow Moskus to testify, given that it was the best evidence available, was not improper. Prior to the Board's September 30, 2007, decision, the prevailing rule in Board proceedings was that the burden of production never shifted to General Counsel, who thus had no reason to collect or preserve evidence related to mitigation. However, when the Board imposed on General Counsel a new duty to produce evidence, it placed General Counsel in an especially untenable position, since the ALJ's initial decision was issued about five years earlier, and the backpay sought covered a period spanning from 1999 to 2000.

By September 2007, most of the evidence that would have corroborated, or been more facially reliable than, Moskus's testimony was unavailable. Indeed, Tharp had died in the five-year interim, and thus, General Counsel could not produce the most obvious evidence of his search, i.e., Tharp's testimony. We agree with the ALJ's ruling that it would not "be appropriate or fair to the innocent, unlawfully discharged employee to require, in the circumstances of this unique case,

more specific evidence of Tharp's search for work than has already been provided." (A8.)

Lastly, St. George argues that General Counsel failed to carry its burden of showing that Tharp exercised reasonable diligence in seeking interim employment in either New Jersey or Florida.

General Counsel produced evidence that Tharp filed for employment benefits the day after he was discharged, and had certified on his application that he was "ready, willing and able" to accept long-term work. On a Board backpay questionnaire, Tharp listed seven New Jersey employers to whom he had applied in the span of five days. Both Moskus and Sarro testified that when Tharp's search in New Jersey proved unsuccessful, he moved to Florida in the hopes of finding more job opportunities. Two weeks after he arrived in Florida in September 1999, he began scanning newspaper listings, submitting applications, and visiting employers. He obtained a job with Naples Lumber the following month, in mid-October 1999, which he held through the end of the backpay period.

We agree that substantial evidence was adduced from which the Board could conclude that General Counsel met its burden of demonstrating the reasonableness of Tharp's job search. As discussed above, the act of registering with the unemployment office is prima facie evidence of reasonable diligence. E.g., Midwestern Personnel, 508 F.3d at 424; Church Homes, 349 N.L.R.B. at 834. The NLRB backpay questionnaire -- the only obtainable documentation of his search -- indicates that Tharp submitted seven applications over five days, and Moskus's testimony corroborated his

20

diligence throughout. Given the unique evidentiary difficulties presented in this case, General Counsel's inability to obtain and produce further documentation should not defeat Tharp's entitlement to backpay. See, e.g., Rainbow Coaches, 280 N.L.R.B. 166, 179 (1986), enforced, 835 F.2d 1436 (9th Cir. 1987) ("Claimants are not disqualified from receiving backpay solely because of poor recordkeeping or uncertain memories."). Moreover, it is significant that Tharp relocated to a different state to find a job, and successfully obtained one in about a month's time. See Midwestern Personnel, 508 F.3d at 423-24 (listing fact that discriminatee accepted job that "required prolonged periods away from home" as probative of reasonable search). Cumulatively, that evidence was enough to demonstrate Tharp's reasonable efforts to attain interim employment.

IV.

For the foregoing reasons, we hold that there was substantial evidence in the record from which the Board could conclude that both Sides and Tharp exercised reasonable diligence in searching for work following their illegal discharge from St. George. Accordingly, we will affirm and enforce the order awarding backpay in the amounts of $26,447.90 to Sides and $14,649.79 to Tharp's estate.