NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 15-2565, 15-2877
_____

NEWARK PORTFOLIO JV, LLC,

Petitioner/Cross Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross Petitioner
_____

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board
(NLRB No. 22-CA-100534)
_____

Argued July 12, 2016
Before: McKEE, *Chief Judge*, SMITH, and HARDIMAN, *Circuit Judges*.

(Filed: September 1, 2016)

John C. Romeo        [Argued]
Gibbons
One Logan Square
130 North 18th Street, Suite 210
Philadelphia, PA 19103

James J. La Rocca
Gibbons
One Gateway Center
Newark, New Jersey 07102
        *Counsel for Newark Portfolio JV, LLC*

Linda Dreeben
Julie B. Broido
Valerie L. Collins    [Argued]
National Labor Relations Board
1015 Half Street NE
Washington, DC 20570
    *Counsel for National Labor Relations Board*

_____

OPINION*

_____

HARDIMAN, *Circuit Judge*.

In these consolidated appeals, Newark Portfolio JV, LLC seeks review of an order of the National Labor Relations Board (NLRB or Board) certifying Local 55 of the Laborers' International Union of North America as the collective bargaining representative for a unit of Newark Portfolio's employees, and the Board seeks enforcement of an order compelling Newark Portfolio to bargain with the Union. Because the Board's decision to certify the Union was not supported by substantial evidence, we will grant Newark Portfolio's Petition for Review and deny the Board's Cross-Application for Enforcement.

I

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

Newark Portfolio employs live-in superintendents, porters, and other maintenance workers at two buildings it owns at 585 and 595 Elizabeth Avenue in Newark, New Jersey. Pursuant to a stipulated election agreement, Newark Portfolio agreed to conduct an election for the Union to represent a bargaining unit comprising ten of its employees. The representation election was scheduled to occur on the morning of July 27, 2012, in the first-floor laundry room of 595 Elizabeth.

Despite the relatively small size of the bargaining unit, in the hour before and during the election, dozens of Union members gathered in front of the buildings, including on the steps leading to the front entrance of 595 Elizabeth.[1] They wore bright orange t-shirts printed with "Local 55" in black lettering and held placards, chanted, and spoke to employees as they entered the building to vote. App. 28–31, 571. Three employees—Gregory Philbert, John Hodge, and Alfredo Bonilla—later testified that the Union members had urged them to vote for Local 55 by telling them to "do the right thing" and promising "a lot of benefits" if the Union won. App. 28. Philbert, who lives at 585 Elizabeth, also testified that three tenants had called him to complain that Union members were blocking the sidewalk. In addition, Philbert stated that his wife delayed taking their daughter to school that day because she felt "intimidated." App. 28, 77–89.

---

[1] The parties disagree on the exact number of Union members that were present during the election. Newark Portfolio claims there were about 40; the Board and the Union point to a lower number between 20 and 30; the NLRB Hearing Officer that adjudicated the employer's objections to the election summarized the relevant testimony as between 15 and 40.

Union members did not enter 595 Elizabeth and no campaigning took place in the laundry room where voting took place.

Just before the voting started, the Board Agent conducting the election held a conference in the laundry room of 595 Elizabeth that included Newark Portfolio's attorney and the Union's business manager, Hector Fuentes. Also present were Union organizers Martinique Whaley and Manuel Escobar, as well as the Union's election observer (Roberto Jiminez) and Newark Portfolio's superintendent for 595 Elizabeth.

The parties dispute what happened at the pre-election conference. Newark Portfolio contends that in response to a complaint from its attorney, the Board Agent instructed the electioneering in front of 595 Elizabeth to cease. For its part, the Board insists that the Agent issued, at most, a "general[]" no-electioneering directive. App. 13. Regardless, the Union continued its campaign even as voting began and Philbert testified that as he walked from 585 Elizabeth to 595 Elizabeth to cast his vote, an unknown person in a bright orange t-shirt shouted at him: "These Jews don't care about you, they only care about the money." App. 38; *see also* App. 96–100. It was widely known that the owners of Newark Portfolio are Jewish.

II

The Union won the election by a single vote, with six in favor and four opposed. Newark Portfolio filed objections to the election, specifically pointing to the anti-Semitic slur and electioneering in front of 595 Elizabeth as sufficient reasons for setting aside the election. Two days of hearings were conducted before an NLRB Hearing Officer in

4

August 2012. Philbert, Hodge, and Bonilla testified for the employer. Jiminez and two other Newark Portfolio employees—Gelmy Villagran and José Rosa—testified on behalf of the Union, along with Fuentes, Escobar, and Whaley.

The Hearing Officer issued a report overruling Newark Portfolio's objections and recommending the Union's certification. The Hearing Officer credited the testimony of Philbert, Hodge, Bonilla, Jiminez, Villagran, and Rosa, finding that each "individual['s] testimony was internally consistent and plausible, and was substantially corroborated by the other credited witnesses." App. 33–34. With respect to Fuentes, Escobar, and Whaley, however, the Hearing Officer did not credit their testimony "where it contradicts or conflicts with the testimony of the credited witnesses or where their own testimony is inconsistent." *Id.* Based on this evidence, the Hearing Officer found that the anti-Semitic remark was insufficient to set aside the election under the Board's rule addressing appeals to racial and religious prejudice articulated in *Sewell Manufacturing, Inc.*, 138 N.L.R.B. 66 (1962). The Hearing Officer also overruled Newark Portfolio's objection to the Union's electioneering, finding both that the per se rule against speaking to employees in the polling area under *Milchem, Inc.*, 170 N.L.R.B. 362 (1968), was inapplicable and that the Union's campaign did not violate the general standard for electioneering under *Boston Insulated Wire & Cable Co.*, 259 N.L.R.B. 1118 (1982). After considering Newark Portfolio's exceptions, the Board upheld the Hearing Officer's determinations and certified the Union.

## III[2]

Under *Boston Insulated Wire*, the Board assesses electioneering conduct under a

multifactor, totality-of-the-circumstances test.

> The Board considers not only whether the conduct occurred within or near
> the polling place, but also the extent and nature of the alleged
> electioneering, and whether it is conducted by a party to the election or by
> employees. The Board has also relied on whether the electioneering is
> conducted within a designated "no electioneering" area or contrary to the
> instructions of the Board agent.

259 N.L.R.B. at 1118–19.

In considering the last factor of *Boston Insulated Wire*, the Board found as a

factual matter that "the Board [A]gent stated generally that electioneering would not be

---

[2] A certification order is not a "final" order subject to judicial review under the National Labor Relations Act, and can be reviewed only after the employer refuses to bargain with the union and triggers an unfair labor practice proceeding. *See Am. Fed'n of Labor v. NLRB*, 308 U.S. 401, 411 (1940); *see also* 29 U.S.C. § 160(f). The Board had jurisdiction to adjudicate Newark Portfolio's refusal to bargain under § 10(a) of the NLRA, and we have jurisdiction to review both the employer's Petition for Review and the Board's Cross-Application for Enforcement under §§ 10(e) and (f), 29 U.S.C. §§ 160(a), (e), and (f). Because the Board's unfair labor practice proceeding implicates an underlying representation election, we have jurisdiction to consider the merits of both agency actions. *See* 29 U.S.C. § 159(d); *see also Trimm Assocs., Inc. v. NLRB*, 351 F.3d 99, 102 (3d Cir. 2003). We also note that the Board reissued its certification order in light of *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), and that Newark Portfolio has not challenged the validity of the recertification.

We review the Board's findings of fact for substantial evidence based on the entire record before the agency. *See* 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Thus "we must decide whether on [the] record [as a whole] it would have been possible for a reasonable jury to reach the Board's conclusion." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366–67 (1998). The Hearing Officer's credibility determinations are given substantial deference. *NLRB v. St. George Warehouse, Inc.*, 645 F.3d 666, 671–72 (3d Cir. 2011).

permitted, *but the [A]gent did not designate a specific 'no electioneering' area.*" App. 13 (emphasis added).[3] Accordingly, the Board held that this factor favored certifying the Union. We agree with Newark Portfolio that the Board erred in this regard.

"When the Board purports to be engaged in simple factfinding, unconstrained by substantive presumptions or evidentiary rules of exclusion, it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Allentown Mack*, 522 U.S. at 378. Nor may the Board "disregard[]" evidence contrary to its factual conclusions. *Id.* at 369. Here, not only is there no evidence to support the Board's finding that the Agent did not designate a no-electioneering zone, the record points to the contrary.

Escobar's testimony strongly supports the inference that the Board Agent did, in fact, designate the front of 595 Elizabeth as a no-electioneering zone during the pre-election conference. A Union organizer who testified on behalf of Local 55, Escobar agreed with the statement that the Board Agent told "both sides, the union and the employer, that there should be no electioneering taking place *out in front of the building*." App. 479 (emphasis added).

_____

[3] Unlike a specific no-electioneering directive, a general directive against electioneering applies only to the customarily proscribed area, *i.e.*, "at or near the polls." *See Boston Insulated Wire*, 259 N.L.R.B. at 1118–19 (distinguishing conduct "within or near the polling place" from that "within a designated 'no electioneering' area"); *Bally's Park Place, Inc.*, 265 N.L.R.B. 703 (1982) (noting the "customary" area).

The Board argues that it properly disregarded Escobar's testimony because the Hearing Officer discredited him as "unreliable." NLRB Br. 20–21; App. 34. But the Hearing Officer did not discredit Escobar's testimony in its entirety; it was discredited only "where it contradicts or conflicts with the testimony of the credited witnesses or where [his] testimony [was] inconsistent." App. 34. And because Escobar's admission was neither internally inconsistent nor conflicted with the testimony of a credited witness—it was among the evidence that the Board should have considered. *Id.* Along with Jiminez—who testified that the Board Agent said "something like" that "there should be no electioneering," App. 249–50—Escobar's testimony is the only probative evidence as to whether the Board Agent designated the front of 595 Elizabeth as a no-electioneering zone during the pre-election conference.[4]

Accordingly, the Board's conclusion that its Agent "did not designate a specific 'no-electioneering' area" did not evaluate Escobar's testimony properly, App. 13, and its

_____

[4] At oral argument, the Board clarified its position by pointing to other parts of Jiminez's testimony in which he appeared to deny that the Board Agent issued any kind of no-electioneering instruction. *See* App. 231–34. This would place Escobar's testimony in conflict with that of Jiminez, a credited witness, thereby rendering Escobar's testimony outside the evidence before the Board. However, Jiminez spoke through a translator, and it is apparent that he did not understand several of counsel's questions. In the remaining portion of Jiminez's testimony that the Board has directed us to, it is ambiguous whether Jiminez was referring to the front of 595 Elizabeth or the laundry room when he testified that the Agent "just said the . . . union can't be there, and the lawyer can't be there." App. 233–34. However, counsel later revisited this area of inquiry, and Jiminez clearly testified that the agent said that "there should be no electioneering." App. 249–50. As a factual matter, this "general" no-electioneering instruction is consistent with the specific instruction that the parties were not to campaign in a particular area. For that reason, we reject the Board's argument that Jiminez's testimony conflicts with Escobar's admission.

8

finding that she only "stated generally that that electioneering would not be permitted," *id.*, was contrary to the inference "fairly demand[ed] by the weight of the evidence," *Allentown Mack*, 522 U.S. at 378. The Board's analysis of *Boston Insulated Wire* was therefore not supported by substantial evidence. And because the Board did not consider the anti-Semitic remark overheard by Philbert in the context of the Union's violation of the Agent's prohibition on electioneering outside of 595 Elizabeth, we cannot know whether that remark could be found harmless under either *Boston Insulated Wire* or *Sewell*. We therefore cannot conclude that the Board's certification order was supported by substantial evidence on the record as a whole.[5]

\* \* \*

For the stated reasons, we will grant Newark Portfolio's Petition for Review and deny the Board's Cross-Application for Enforcement.

---

[5] Judge Smith would affirm the Board's conclusion that "[t]he evidence indicates that before opening the polls . . . the agent did not designate a specific 'no electioneering' area" under the substantial evidence standard. App. 44. *See Allentown Mack Sales and Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 366-67 (1998) (describing the standard as "whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion"). However, he would also remand, because he believes that the Board improperly placed the burden on Newark Portfolio to show that the anti-Semitic statement was harmless. Compare App. 45 ("[T]he Employer adduced no evidence suggesting that any religious tensions existed in the workplace or that the [Union] sought to engender conflict through a broader inflammatory campaign theme.") with *N.L.R.B. v. Silverman's Men's Wear, Inc.*, 656 F.2d 53, 60 (3d Cir. 1981) (holding that a hearing was necessary in order to show, among other things, whether the "totality of circumstances surrounding [the racially inflammatory remark] evinced an atmosphere in which those remarks may reasonably be expected to have had a significant impact on the employees' free exercise of choice" and that the "burden of proving that the utterance was harmless" was on the party responsible for the racial slur).

9